## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

NATIONAL WILDLIFE FEDERATION,                 Case No. _____

          Plaintiff,

    v.                                          Judge _____

SECRETARY OF THE UNITED STATES                Magistrate Judge _____
DEPARTMENT OF TRANSPORTATION,
in his official capacity, and ADMIISTRATOR
OF THE PIPELINE AND HAZARDOUS
MATERIALS SAFETY ADMINISTRATION,
in her official capacity,

_____Defendants._____/

_____

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

_____

### INTRODUCTION

1.    This action arises from unlawful approvals of plans for responding to spills from oil pipelines. Defendant Secretary of the U.S. Department of Transportation ("the Secretary") and Defendant Administrator of the Pipeline and Hazardous Materials Safety Administration ("the Administrator," "PHMSA," or "Agency") gave the approvals.

2.    On July 6 and October 2, 2015, PHMSA approved two response plans submitted by Enbridge (U.S.) Inc. ("Enbridge") for an oil pipeline known as

1

Line 5. Line 5 consists both of onshore pipelines (located in, on, or under land) and offshore pipelines (located in, on, or under navigable waters landward of the sea). Line 5 runs from Superior, Wisconsin, through the Upper Peninsula of Michigan, across the Straits of Mackinac, through the Lower Peninsula of Michigan, across the St. Clair River, and then to Sarnia, Ontario, Canada.

3.      Enbridge prepared the response plans to comply with the Clean Water Act. The Clean Water Act requires Enbridge to have such plans for Line 5. The federal government must determine that these plans prevent a substantial threat of a worst-case discharge of oil and provide for the removal of a worst-case discharge of oil, among other things, before Enbridge may use Line 5 to handle, store, or transport oil. PHMSA determined that the response plans meet the requirements of regulations applicable to onshore pipelines.

4.      On August 18, 2016, the Secretary also approved the Enbridge response plans by ratifying PHMSA's approvals, which were based on a determination that the response plans meet the requirements of regulations applicable to onshore pipelines.

5.      Despite the Secretary's ratification, PHMSA's approvals of the Enbridge response plans for the offshore pipelines making up Line 5 were not final because the approvals were not accompanied by the required determination that the plans meet the requirements applicable to offshore pipelines, which are found in

2

the Clean Water Act, not in regulations applicable to onshore pipelines. In the alternative, PHMSA's approvals of the plans for the offshore pipelines making up Line 5 were unlawful because the Agency's authority at the time was limited to the regulation of onshore pipelines, rendering the approvals of the plans for the offshore pipelines either not in accordance with law or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

6.    In another alternative, PHMSA's approvals of the Enbridge response plans for the offshore pipelines making up Line 5 were unlawful because the Agency failed (a) to determine that the plans for the offshore pipelines meet the requirements of the Clean Water Act, (b) to examine the relevant data, or (c) to articulate any explanation or a satisfactory explanation for approving the plans for the offshore pipelines, rendering the approvals arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

7.    PHMSA's approvals of the Enbridge response plans for the onshore pipelines making up Line 5 were unlawful because the Agency failed (a) to examine the relevant data; or (b) to articulate any explanation or a satisfactory explanation for (i) determining that the plans for the onshore pipelines meet the requirements of the Clean Water Act, or (ii) approving the plans for the onshore pipelines; rendering the approvals arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

8.     The Secretary's approvals of the Enbridge response plans for the offshore pipelines making up Line 5 were not final because the approvals were not accompanied by the required determination that the plans meet the requirements of the Clean Water Act. In the alternative, the Secretary's approvals were unlawful because the Secretary failed (a) to consider the merits of PHMSA's approvals of the plans for the offshore pipelines, (b) to review the plans for the offshore pipelines, (c) to determine that the plans for the offshore pipelines meet the requirements of the Clean Water Act, (d) to examine the relevant data, or (e) to articulate any explanation or a satisfactory explanation for approving the plans for the offshore pipelines, rendering the approvals arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

9.     The Secretary's approvals of the Enbridge response plans for the onshore pipelines making up Line 5 were unlawful because the Secretary failed (a) to consider the merits of PHMSA's approvals of the plans for the onshore pipelines; (b) to review the plans for the onshore pipelines; (c) to examine the relevant data; or (d) to articulate any explanation or a satisfactory explanation for (i) determining that that the plans for the onshore pipelines meet the requirements of the Clean Water Act, or (ii) approving the plans for the onshore pipelines; rendering the approvals arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

10.     PHMSA's and the Secretary's approvals of the Enbridge response plans for Line 5 were also unlawful because neither PHMSA nor the Secretary complied with the National Environmental Policy Act before approving the response plans, unlawfully withholding discrete action PHMSA and the Secretary were required to take first, or rendering the approvals arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

11.     PHMSA's approvals of the Enbridge response plans for Line 5 were also unlawful because PHMSA failed to comply with the Endangered Species Act before approving the response plans, unlawfully withholding discrete action PHMSA was required to take first, or rendering the approvals arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

12.     Among other things, Plaintiff National Wildlife Federation ("NWF") seeks an order setting aside both the Secretary's and PHMSA's approvals of the response plans for Line 5; compelling the Secretary and PHMSA to comply with the National Environmental Policy Act before approving response plans for Line 5; and compelling PHMSA to comply with the Endangered Species Act before approving response plans for Line 5.

## JURISDICTION AND VENUE

13.     On September 13, 2016, NWF sent PHMSA an amended notice of intent to sue for violations of the Endangered Species Act. In particular, the notice

5

informed PHMSA of NWF's intent to sue for PHMSA's failure, prior to approving the response plans for Line 5, (1) to determine whether species listed or proposed to be listed may be present in the area traversed by Line 5, (2) to determine whether approving the response plans may affect listed species or critical habitat in the area traversed by Line 5, or (3) to consult with the U.S. Fish and Wildlife Service. A copy of the amended notice of intent to sue is attached to this complaint as "Exhibit 1." More than sixty days have passed since NWF provided PHMSA with notice. PHMSA has not performed its nondiscretionary duties under the ESA.

14. An actual, substantial, and continuing controversy exists between the parties. A declaration of NWF's rights and other legal relations is necessary.

15. This Court has jurisdiction over this controversy pursuant to 16 U.S.C §1540(g)(1); 28 U.S.C. § 1331; 28 U.S.C. § 1361; 28 U.S.C. § 2201; 28 U.S.C. § 2202; 33 U.S.C. § 1321(n); or 33 U.S.C. § 2717(b). NWF is entitled to this Court's review pursuant to the Administrative Procedure Act, 5 U.S.C. § 702.

16. Venue is proper in this district pursuant to 16 U.S.C. § 1540(g)(3)(A); 28 U.S.C. § 1391(e); or 33 U.S.C. § 2717(b). NWF challenges the Secretary's and PHMSA's approvals of the Enbridge response plans for Line 5, which runs through Michigan, affecting land and waters situated, in part, in Cheboygan, Ostego, Crawford, Oscoda, Ogemaw, Arenac, Bay, Saginaw, Tuscola, Lapeer, and Saint

Clair counties. A substantial part of the events or omissions giving rise to NWF's claims occurred in this district.

## PARTIES

17.    NWF is the nation's largest not-for- profit conservation advocacy and education organization. NWF has more than 690,000 members nationwide, including more than 24,000 members in Michigan. NWF's mission is to unite all Americans to ensure wildlife thrive in a rapidly changing world. NWF's mission includes protecting wildlife, navigable waters, and other natural resources from the impacts of oil spills. NWF is a District of Columbia nonprofit corporation with its principal office located in Virginia and a Great Lakes office headquartered at 213 West Liberty Street, Second Floor, Ann Arbor, Michigan, 48104.

18.    The Secretary is sued in his official capacity. The Secretary is the head of the U.S. Department of Transportation. At the times Enbridge's response plans for Line 5 were approved in 2015, the Secretary, rather than any Operating Administration within the U.S. Department of Transportation, was the sole authority responsible for reviewing response plans for offshore pipelines, determining whether plans for offshore pipelines met the requirements of the Clean Water Act, and, if the plans met those requirements, approving them.

19.    The Administrator is sued in her official capacity. PHMSA is an Operating Administration of the U.S. Department of Transportation. At the times

Enbridge's response plans for Line 5 were approved in 2015, the Secretary had authorized PHMSA to exercise his authority and responsibility to review plans for onshore pipelines, determine whether plans for onshore pipelines met the requirements of the Clean Water Act and, if the plans met those requirements, approve them.

### STANDING

20.     NWF files this action on behalf of itself and its members.

21.     One or more of NWF's members have standing in this action because they reside or have a residence in Michigan near land or waters traversed by Line 5. These members include one or more members who reside or have a residence near the St. Clair River or the Straits of Mackinac.

22.     One or more of NWF's members have standing in this action because they use or enjoy land or waters traversed by Line 5 for scientific research, the recovery of endangered or threatened species, recreational pursuits, or aesthetic enjoyment. This member or these members intend to continue to use or enjoy land or waters traversed by Line 5 for scientific research, the recovery of endangered or threatened species, recreational pursuits, or aesthetic enjoyment on a regular, ongoing basis now and in the future, including this year.

23.     One or more of NWF's members have been, are, or may be adversely affected or aggrieved by the Secretary's and PHMSA's unauthorized, ineffective,

or unlawful approvals of the response plans for the offshore pipelines making up Line 5. The Secretary's and PHMSA's approvals of the plans for these offshore pipelines has, is, or may adversely affect the residences of one or more of NWF's members or the areas that one or more of NWF's members use or enjoy for scientific research, the recovery of endangered or threatened species, recreational pursuits, or aesthetic enjoyment. These adverse effects have, are, or may occur because, based on these approvals, Enbridge has and does handle or transport oil through the offshore pipelines making up Line 5 without plans that meet the requirements of the Clean Water Act since (a) PHMSA lacked authority to approve plans for the offshore pipelines; (b) PHMSA did not determine that the plans for the offshore pipelines meet the only requirements applicable to offshore pipelines, which are found in the Clean Water Act itself; or (c) the Secretary has not reviewed the plans for the offshore pipelines or determined that such plans meet the requirements of the Clean Water Act. As a result, the interests of NWF's members have been and are exposed to a substantial threat of a worst-case discharge of oil and to the injuries from a worst-case discharge of oil that plans for the offshore pipelines lawfully determined to meet the requirements of the Clean Water Act would mitigate, prevent, and remove. This adversely affects or aggrieves their interests, including their use or enjoyment of their residences, recreation, or aesthetic pursuits.

9

24.     One or more of NWF's members have been, are, or may be adversely affected or aggrieved by the Secretary's and PHMSA's unlawful approvals of the response plans for the onshore pipelines making up Line 5. The Secretary's and PHMSA's approvals of the plans for these onshore pipelines has, is, or may adversely affect the residences of one or more of NWF's members or the areas that one or more of NWF's members use or enjoy for scientific research, the recovery of endangered or threatened species, recreational pursuits, or aesthetic enjoyment. These adverse effects have, are, or may occur because, based on these approvals, Enbridge has and does handle or transport oil through the onshore pipelines making up Line 5 without plans that meet the requirements of the Clean Water Act since (a) PHMSA failed to articulate any explanation or a satisfactory explanation for approving the plans for the onshore pipelines and determining that they meet the requirements of the Clean Water Act or (b) the Secretary failed to consider the merits of PHMSA's approvals, to review the response plans for the onshore pipelines, or to articulate any explanation or a satisfactory explanation for approving the plans for the onshore pipelines and determining that they meet the requirements of the Clean Water Act. As a result, the interests of NWF's members have been and are exposed to a substantial threat of a worst-case discharge of oil and to the injuries from a worst-case discharge of oil that plans for the onshore pipelines lawfully determined to meet the requirements of the Clean Water Act

10

would mitigate, prevent, and remove. This adversely affects or aggrieves their interests, including their use or enjoyment of their residences, recreation, or aesthetic pursuits.

25.     One or more of NWF's members have been, are, or may be adversely affected or aggrieved by PHMSA's failure to comply with the National Environmental Policy Act or the Endangered Species Act in approving the Enbridge response plans. PHMSA's approval of the plans has, is, or may adversely affect the residences of one or more of NWF's members or the areas that one or more of NWF's members use or enjoy for scientific research, the recovery of endangered or threatened species, recreational pursuits, or aesthetic enjoyment. These adverse effects have, are, or may occur because the approvals allow Enbridge to handle or transport oil through Line 5 without a prior evaluation and disclosure of the potential environmental impacts of operating Line 5 or without ensuring that the operation of Line 5 will not jeopardize the existence of endangered or threatened species or destroy or adversely modify critical habitat.

26.     One or more of NWF's members have been, are, or may be adversely affected or aggrieved by the Secretary's failure to comply with the National Environmental Policy Act in approving the Enbridge response plans. The Secretary's approval of the plans has, is, or may adversely affect the residences of one or more of NWF's members or the areas that one or more of NWF's members

use or enjoy for scientific research, the recovery of endangered or threatened species, recreational pursuits, or aesthetic enjoyment. These adverse effects have, are, or may occur because the approvals allow Enbridge to handle or transport oil through Line 5 without a prior evaluation and disclosure of the potential environmental impacts of operating Line 5.

27. The interests of NWF and its members fall within the zone of interests protected under the Clean Water Act, National Environmental Policy Act, and Endangered Species Act.

28. The Secretary's and PHMSA's violations of the Clean Water Act and the National Environmental Policy Act described in this complaint cause NWF and one or more of its members injury for which they have no adequate remedy at law.

29. The relief NWF seeks will redress the injuries to NWF and one or more of its members caused by the Secretary's violations of the Clean Water Act and the National Environmental Policy Act described in this complaint.

30. The relief NWF seeks will redress the injuries to NWF and one or more of its members caused by PHMSA's violations of the Clean Water Act, National Environmental Policy Act, and Endangered Species Act described in this complaint.

# STATEMENT OF THE CASE

## Statutory and Regulatory Background

### The Clean Water Act

31.     The purpose of the Clean Water Act ("CWA") is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

32.     Congress declared "that it is the policy of the United States that there should be no discharges of oil … into or upon the navigable waters of the United States, [or] adjoining shorelines." 33 U.S.C. § 1321(b)(1).

33.     On August 18, 1990, Congress enacted the Oil Pollution Act of 1990 ("OPA"), amending § 311(j) of the CWA, 33 U.S.C. § 1321(j). OPA, Pub. L. No. 101-380, § 4202(a)(6), 104 Stat. 484 (1990). Congress intended the amendments to prevent a repetition of the disaster caused by the Exxon *Valdez* oil spill in Alaska's Prince William Sound on March 23, 1989.

34.     The OPA defines a "facility" in pertinent part to mean "any structure, [or] group of structures … which is used for … transporting oil. This term includes any … pipeline used for … [this] purpose[]." 33 U.S.C. § 2701(9).

35.     The CWA defines an "onshore facility" in pertinent part to mean "any facility [meaning any structure or group of structures used to transport oil] … of

13

any kind [including a pipeline] located in, on, or under, any land within the United States other than submerged land." 33 U.S.C. §§ 1321(a)(10), 2701(9).

36.     The CWA defines an "offshore facility" in pertinent part to mean "any facility [meaning any structure or group of structures used to transport oil] … of any kind [including a pipeline] located in, on, or under, any of the navigable waters of the United States." 33 U.S.C. §§ 1321(a)(11), 2701(9).

37.     Reading the statutory definitions of "facility," "onshore facility," and "offshore facility" together, a group of connected onshore pipelines and offshore pipelines is a "facility," as the OPA defines that term.

38.     The OPA amended the CWA to prohibit the handling, storage, or transport of oil until owners or operators (collectively, "operators") of all offshore facilities and certain onshore facilities comply with a plan reviewed and determined by the President, among other things, (a) to be consistent with the requirements of the National Contingency Plan and Area Contingency Plans, (b) to ensure the availability of resources necessary both to mitigate or prevent a substantial threat of a worst-case discharge of oil and to remove, to the maximum extent practicable, a worst-case discharge of oil, and (c) to describe the response actions to be carried out to mitigate or prevent a substantial threat of a worst-case discharge of oil and to mitigate or prevent a worst-case discharge of oil. OPA, Pub. L. No. 101-380, § 4202(a)(6) (codified at 33 U.S.C. § 1321(j)(5)(D)-(F)).

39.     The National Contingency Plan protects endangered species and requires evaluations "to assess threats to the environment, especially sensitive habitats and critical habitats of species protected under the Endangered Species Act." 40 C.F.R. § 300.430(e)(2)(i)(G).

40.     The Area Contingency Plan must, "when implemented in conjunction with the National Contingency Plan, be adequate to remove a worst case discharge, and to mitigate or prevent a substantial threat of such a discharge, from a vessel, offshore facility, or onshore facility operating in or near the area." 33 U.S.C. § 1321(j)(4)(C)(i).

41.     "Remove" means "containment and removal of the oil … from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches." 33 U.S.C. § 1321(a)(8).

42.     "Worst case discharge" means "the largest foreseeable discharge in adverse weather conditions." 33 U.S.C. § 1321(a)(24)(B).

43.     The OPA imposed on the President a nondiscretionary duty to review response plans submitted by operators and, if he determines that they meet the CWA's requirements, to approve them not later than August 18, 1993. OPA, Pub.

L. No. 101-380, § 4202(a)(6) (codified at 33 U.S.C. § 1321(j)(5)(F)), §

4202(b)(4)(B), 104 Stat. 484 (1990).

44.     The review, determination of adequacy, and approval of response

plans required by the CWA necessitates the President's exercise of discretion to

consider environmental effects.

45.     The CWA authorizes the President to delegate the administration of

CWA § 311(j) "to the heads of those Federal departments, agencies, and

instrumentalities which he determines to be appropriate." 33 U.S.C. § 1321(l).

46.     In 1991, in section 2(d)(2) of Executive Order 12777, the President

delegated to the Secretary the President's nondiscretionary duties under CWA

§ 311(j)(5) and OPA § 4202(b)(4) with respect to response plans submitted by

operators of transportation-related onshore facilities. Exec. Order No. 12777

§ 2(d)(2), 56 Fed. Reg. 54757, 54761 (1991).

47.     In 1992, the Secretary subdelegated his nondiscretionary duties with

respect to response plans for onshore pipelines to the Research and Special

Programs Administration ("RSPA"). Organization and Delegation of Powers and

Duties, 57 Fed. Reg. 62,483, 62,484 (Dec. 31, 1992) (authorizing RSPA to carry

out the functions and exercise the authority delegated to the Secretary in EO

§ 2(d)(2)). The Secretary later subdelegated these nondiscretionary duties to

PHMSA, authorizing PHMSA to exercise the Secretary's authority with respect to plans for onshore pipelines. 49 C.F.R. §§ 1.2(b)(8), 1.97(c)(2).

48.     On January 5, 1993, RSPA issued regulations for onshore oil pipelines subject to the CWA. Response Plans for Onshore Oil Pipelines, 58 Fed. Reg. 244, 245 (Jan. 5, 1993). These regulations require response plans for "onshore oil pipelines" only. *Id.* at 253 (codified at 49 C.F.R. § 194.1). They define "onshore oil pipeline facilities" to mean "pipe … used in the transportation of oil located in, on, or under, any land within the United States other than submerged land." *Id.* at 254 (codified at 49 C.F.R. § 194.5). They "appl[y] to an operator of an onshore oil pipeline that, because of its location, could reasonably be expected to cause substantial harm, or significant and substantial harm to the environment by discharging oil into or on any navigable waters of the United States or adjoining shorelines." *Id.* at 253 (codified at 49 C.F.R. § 194.3). They define an "operator" to mean "a person who owns or operates onshore oil pipeline facilities." *Id.* at 254 (codified at 49 C.F.R. § 194.5). Therefore, the requirements imposed by the regulations apply only to persons who own or operate an onshore pipeline facility. *See id.* at 255 (requiring each "operator" to determine the worst-case discharge, codified at 49 C.F.R. § 194.105), 255-56 (imposing general response plan requirements, codified at 49 C.F.R. § 194.107). The regulations impose no requirements on persons who own or operate offshore pipelines.

49.     In section 2(d)(3) of Executive Order 12777, the President delegated to the Secretary of the Interior ("Interior") the President's nondiscretionary duties under CWA § 311(j)(5) and OPA § 4202(b)(4) with respect to response plans submitted by operators of offshore facilities. Exec. Order No. 12777 § 2(d)(3), 56 Fed. Reg. 54757, 54761 (1991).

50.     In section 2(i) of Executive Order 12777, the President authorized a recipient of the delegation of the President's nondiscretionary duties under CWA § 311(j)(5) or OPA § 4202(b)(4) to redelegate those duties "to the head of any Executive department or agency with his or her consent." Exec. Order No. 12777 § 2(i), 56 Fed. Reg. 54757, 54763 (1991).

51.     On February 3, 1994, pursuant to § 2(i) of Executive Order 12777, the Administrator of the U.S. Environmental Protection Agency ("EPA"), Interior, and the Secretary signed a Memorandum of Understanding ("MOU") "establish[ing] the jurisdictional responsibilities for offshore facilities, including pipelines, pursuant to section … [311](j)(5) … of the Clean Water Act (CWA), as amended by the Oil Pollution Act of 1990." 40 C.F.R. § Pt. 112, App. B.

52.     The Secretary accepted jurisdictional responsibility for transportation-related offshore facilities landward of the coast line, recognizing that CWA § 311(a)(11)'s definition of "offshore facility" expanded Interior's "traditional … role of regulating facilities on the Outer Continental Shelf … to include inland

18

lakes, rivers, streams, and any other inland waters." 40 C.F.R. § Pt. 112, App. B.

He then consented to Interior's re-delegation to him the "responsibility [under EO

§ 2(d)(3)] for transportation-related facilities, including pipelines, landward of the

coast line." *Id.*

53.    Until August 18, 2016, the Secretary retained his nondiscretionary

duties with respect to response plans for offshore pipelines. Until August 18, 2016,

the Secretary had not subdelegated these duties to RSPA, PHMSA, or any other

unit within the U.S. Department of Transportation.

54.    Until August 18, 2016, PHMSA did not have any authority with

respect to response plans for offshore pipelines.

55.    On August 18, 2016, the Secretary for the first time subdelegated his

nondiscretionary duties with respect to response plans for offshore pipelines to

PHMSA.

National Environmental Policy Act

56.    Congress enacted NEPA to require federal agencies to incorporate

environmental concerns into the decision-making process. 42 U.S.C. § 4331(a)-(b).

NEPA compels federal agencies to evaluate the environmental effects of proposed

actions before carrying them out, funding them, or authorizing them, and it

provides the public with an opportunity to participate in the decision-making

process.

57.    The Council on Environmental Quality has promulgated regulations implementing NEPA that are binding on all Federal agencies. 40 C.F.R. § 1500.3.

58.    NEPA requires federal agencies to prepare an environmental impact statement ("EIS") when a proposal to take a major federal action raises substantial questions whether that action may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C).

59.    Major federal actions include "new and continuing activities, including projects and programs entirely or partly … regulated … or approved by federal agencies." 40 C.F.R. § 1508.18(a)

60.    An EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.  It "shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions." *Id*.

61.    An EIS must include (a) the environmental effects of the alternatives, including the proposed action; (b) any adverse environmental effects that cannot be avoided if the proposed action proceeds; (c) the relationship between short-term uses of the human environment and the maintenance and enhancement of longterm productivity; and (d) any irreversible or irretrievable commitments of resources

20

that would be involved in the proposed action, if implemented. 40 C.F.R.
§ 1502.16.

62.    An EIS must analyze effects of the alternatives, including the
proposed action. 40 C.F.R. § 1508.8. "Effects includes ecological (such as the
effects on natural resources and on the components, structures, and functioning of
affected ecosystems), aesthetic, historic, cultural, economic, social, or health,
whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

63.    An agency "shall not commit resources prejudicing selection of
alternatives before making a final decision." 40 C.F.R. § 1502.2(f).

## Endangered Species Act

64.    In enacting the ESA, Congress declared that "all Federal departments
and agencies shall seek to conserve endangered species and threatened species."
16 U.S.C. § 1531(c) (1).

65.    The ESA requires federal agencies to "insure that any action
authorized, funded, or carried out by such agency … is not likely to jeopardize the
continued existence of any endangered species or threatened species or result in the
destruction or adverse modification of habitat of such species." 16 U.S.C.
§ 1536(a)(2); 50 C.F.R. § 402.14(a).

21

66.    Agency actions are broadly defined by regulation as "encompassing all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States." 50 C.F.R. § 402.02.

67.    To assist federal agencies in complying with their substantive duty to prevent jeopardy or destroy or adversely modify critical habitat, the ESA establishes a mandatory interagency consultation process for major federal actions significantly affecting the quality of the human environment. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. The threshold for triggering consultation under the ESA is low; the ESA requires federal agencies to consult with the Secretary of Interior whenever their actions "may affect" a listed species or its critical habitat. 16 U.S.C. § 1536(a)(2)-(c); 50 C.F.R. § 402.14(a).

68.    The first step of the consultation process – the inventory requirement – requires the agency proposing action ("the action agency") to ask the U.S. Fish and Wildlife Service ("FWS") "whether any species which is listed or proposed to be listed may be present in the area of such proposed action." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(b). More particularly, the action agency must convey "either (1) a written request for a list of any listed or proposed species or designated or proposed critical habitat that may be present in the action area; or (2) a written notification of the species and critical habitat that are being included in the biological assessment." 50 C.F.R. § 402.12(c).

69.     The next step of the consultation process is the biological assessment requirement. If, in response to an action agency's request for information about the presence of species listed or proposed to be listed, the FWS "advises … that such species may be present, such [action] agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." 16 U.S.C. § 1536(c)(1).

70.     If an action agency determines, based on a biological assessment, that its proposed action "may affect" a threatened or endangered species, formal consultation is required to insure that the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical." 16 U.S.C. § 1536(a)(2). This is the last step of the consultation process.

71.     If the biological opinion finds jeopardy or adverse modification, the FWS must "suggest those reasonable and prudent alternatives" that the action agency or applicant for action agency approval can take in implementing the action that the FWS believes would not jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b).

## Factual Background

72.     Enbridge's Line 5 handles, stores, or transports up to 22.7 million gallons per day of crude oil or natural gas liquids.

73.     Line 5 extends approximately 641 miles from Superior, Wisconsin, through Michigan, to Sarnia, Ontario, Canada. In the Upper Peninsula of Michigan, Line 5 passes through the following counties: Gogebic, Iron, Dickinson, Marquette, Delta, Schoolcraft, and Mackinac. In the Lower Peninsula of Michigan, Line 5 passes through the following counties: Emmet, Cheboygan, Otsego, Crawford, Oscoda, Ogemaw, Arenac, Bay, Saginaw, Tuscola, Lapeer, and Saint Clair.

74.     Segments of Line 5 are offshore pipelines, meaning they are located in, on, or under the Straits of Mackinac, which separates the Lower and Upper Peninsulas of Michigan. The Straits of Mackinac connect Lakes Michigan and Huron. The segment of Line 5 crossing under the Straits of Mackinac is an offshore pipeline more than four miles long.

75.     The Straits of Mackinac is a navigable water of the United States.

76.     The Straits of Mackinac and the associated shorelines of islands in or near the Straits or the associated shorelines of the Lower and Upper Peninsula support public health (including the public health benefits of many forms of recreation and aesthetic enjoyment), fish and wildlife (including species protected

24

under the federal Endangered Species Act and their critical habitat), or public or private property.

77.    Segments of Line 5 are located in, on, or under the St. Clair River, adjoining St. Clair County, Michigan. These segments are offshore pipelines.

78.    The St. Clair River is a navigable water of the United States.

79.    The St. Clair River and its associated shoreline in Michigan supports public health (including the public health benefits of many forms of recreation and aesthetic enjoyment), fish and wildlife, or public or private property.

80.    Other segments of Line 5 cross land and other navigable waters in the Lower or Upper Peninsulas that support public health (including the public health benefits of many forms of recreation and aesthetic enjoyment), fish and wildlife (including species protected under the federal Endangered Species Act and their critical habitat), or public or private property.

81.    From 1999 to 2014, pipelines owned or operated by Enbridge and related entities spilled or leaked on over 1,000 occasions and discharged more than five million gallons into the environment. This includes one of the largest inland oil spills in U.S. history: a spill of at least 840,000 gallons in the Kalamazoo River, in Michigan, in 2010.

82.    Line 5 traverses a geographic area that has unique characteristics and that may suffer significant adverse effects as the result of an oil spill. Line 5

25

crosses miles of drinking water or ecological resource areas that are unusually sensitive to environmental damage from a pipeline discharge, as well as wetlands, lakes, and streams. State or local parks, state forests, and national forests are within five miles of Line 5's response zone corridor.

83.    Line 5 crosses or runs in the vicinity of public water supplies, water intakes, and wellhead protection areas; 453 schools; 1,927 medical facilities; several residential clusters and businesses; and both interstate and state highways.

84.    At least twelve species listed as endangered or threatened inhabit one or more Michigan counties crossed by Line 5. These species include the Piping plover (found in Cheboygan, Emmet, and Mackinac counties), Kirtland's warbler (found in Crawford, Delta, Marquette, Oscoda, Ogemaw, and Schoolcraft counties), Hine's emerald dragonfly (found in Mackinac and Presque Isle counties), Hungerford's crawling water beetle (found in Emmet County), Northern long-eared bat (found in most or all Michigan counties), Snuffox mussel (found in St. Clair County), Hart's-tongue fern (found in Mackinac County), Dwarf lake iris (found in Cheboygan, Delta, Emmet, Mackinac, Presque Isle, and Schoolcraft counties), Houghton's goldenrod (found in Cheboygan, Chippewa, Emmet, Mackinac, and Presque Isle counties), Michigan monkey-flower (found in Cheboygan and Mackinac counties), Pitcher's thistle (found in Emmet County), and Lakeside daisy (found in Mackinac County and other Lower Peninsula

counties). The critical habitat of the Piping plover and Hine's emerald dragonfly overlaps the area crossed by Line 5

85.     A discharge of oil from Line 5, and a worst-case discharge of oil in particular, may harm and significantly affect unique cultural or natural resources, fish and wildlife (including species protected under the federal Endangered Species Act or their critical habitat), public health, recreation, tourism, or public or private property.

86.     In 2015, Enbridge submitted two response plans for Line 5 to the Secretary by submitting them to PHMSA as the Secretary's authorized representative. One plan is a Superior Region Response Zone Integrated Contingency Plan (Sequence Number 0866). The other plan is a Chicago Region Response Zone Integrated Contingency Plan (Sequence Number 0867). Both are plans for the offshore and onshore pipelines making up Line 5.

87.     In both response plans, Enbridge represented that Line 5 can be expected to cause significant and substantial harm to the environment in the event of a discharge of oil into or on navigable waters or adjoining shorelines.

88.     On July 6, 2015, and October 2, 2015, PHMSA separately approved the two response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5.

89.     In approving the response plans submitted by Enbridge for the onshore pipelines making up Line 5, PHMSA stated, "We conclude that the Plan complies with PHMSA's regulations concerning onshore oil pipelines found at 49 Code of Federal Regulations (CFR) Part 194."

90.     In approving the response plans submitted by Enbridge for the offshore pipelines making up Line 5, PHMSA failed to make a determination of any kind that the plans for the offshore pipelines comply with the requirements of the Clean Water Act.

91.     Upon information and belief, in approving the response plans submitted by Enbridge for the offshore pipelines making up Line 5, PHMSA failed (a) to examine the relevant data or (b) to articulate any explanation or a satisfactory explanation for approving the plans for the offshore pipelines.

92.     Upon information and belief, in approving the response plans submitted by Enbridge for the onshore pipelines making up Line 5, PHMSA failed (a) to examine the relevant data or (b) to articulate any explanation or a satisfactory explanation for (i) determining that that the plans for the onshore pipelines meet the requirements of the Clean Water Act or (ii) approving the plans for the onshore pipelines.

28

93.     Upon information and belief, on or after PHMSA approved the two Enbridge response plans for Line 5, the two plans were submitted directly to the Secretary.

94.     On August 18, 2016, the Secretary approved the two Enbridge response plans for the offshore and onshore pipelines making up Line 5, stating in a memo of that date to the Administrator, "I hereby **RATIFY** ... PHMSA's prior and current approvals of oil spill response plans submitted pursuant to 49 C.F.R. Part 194 by owners and operators of pipelines located landward of the coast line, including plans covering pipeline segments located in, on, or under inland waters."

95.     In approving the response plans submitted by Enbridge for the offshore pipelines making up Line 5, the Secretary failed to make a determination of any kind that the plans for the offshore pipelines comply with the requirements of the Clean Water Act.

96.     Upon information and belief, in approving the response plans submitted by Enbridge for the offshore pipelines making up Line 5, the Secretary failed (a) to consider the merits of PHMSA's approvals of the plans for the offshore pipelines, (b) to review the plans for the offshore pipelines, (c) to determine that the plans for the offshore pipelines meet the requirements of the Clean Water Act, (d) to examine the relevant data, or (e) to articulate any

explanation or a satisfactory explanation for approving the plans for the offshore pipelines.

97.    Upon information and belief, in approving the response plans submitted by Enbridge for the onshore pipelines making up Line 5, the Secretary failed (a) to consider the merits of PHMSA's approvals of the plans for the onshore pipelines; (b) to review the plans for the onshore pipelines; (c) to examine the relevant data; or (d) to articulate any explanation or a satisfactory explanation for (i) determining that the plans for the onshore pipelines meet the requirements of the Clean Water Act or (ii) approving the plans for the onshore pipelines.

98.    In approving the two response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, PHMSA and the Secretary acknowledged that Line 5 can be expected to cause significant and substantial harm to the environment in the event of a discharge of oil into or on navigable waters or adjoining shorelines.

99.    PHMSA's and the Secretary's approvals of the two response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5 either were major federal actions significantly affecting the quality of the human environment or raised substantial questions whether the approvals may significantly affect the quality of the human environment.

100.   Before approving the two response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, PHMSA and the Secretary failed to prepare an EIS or otherwise comply with the requirements of NEPA or its implementing regulations.

101.   Before approving the two response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, PHMSA failed to submit to FWS (a) a written request for a list of any listed or proposed species or designated or proposed critical habitat that may be present in the area traversed by Line 5 or (b) a written notification of species and critical habitat to be included in a biological assessment.

102.   Before approving the two response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, PHMSA failed to conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by the approvals.

103.   Before approving the two response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, PHMSA failed to formally consult with FWS to ensure that the approvals are not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat of such species.

104.   As a consequence of the Secretary's and PHMSA's approvals of the two Enbridge response plans for the offshore and onshore pipelines making up Line 5, Enbridge is handling, storing, or transporting oil through Line 5 from Superior, Wisconsin, through the Upper Peninsula of Michigan, across the Straits of Mackinac, through the Lower Peninsula of Michigan, across the St. Clair River, and then to Sarnia, Ontario.

## CLAIMS FOR RELIEF

### First Claim for Relief
(Violation of the Clean Water Act by PHMSA – Offshore Pipelines)

105.   NWF re-alleges and incorporates by reference all the allegations set forth above.

106.   PHMSA's approvals of the response plans submitted by Enbridge for the offshore pipelines making up Line 5 violated the CWA and were either not in accordance with law or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

107.   In the alternative, PHMSA's approvals of the response plans submitted by Enbridge for the offshore pipelines making up Line 5 violated the CWA and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**Second Claim for Relief**
(Violation of the Clean Water Act by PHMSA – Onshore Pipelines)

108.   NWF re-alleges and incorporates by reference all the allegations set forth above.

109.   PHMSA's approvals of the response plans submitted by Enbridge for the onshore pipelines making up Line 5 violated the CWA and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**Third Claim for Relief**
(Violation of the Clean Water Act by the Secretary – Offshore Pipelines)

110.   NWF re-alleges and incorporates by reference all the allegations set forth above.

111.   The Secretary's approvals of the response plans submitted by Enbridge for the offshore pipelines making up Line 5 violated the CWA and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**Fourth Claim for Relief**
(Violation of the Clean Water Act by the Secretary – Onshore Pipelines)

112.   NWF re-alleges and incorporates by reference all the allegations set forth above.

113.   The Secretary's approvals of the response plans submitted by Enbridge for the onshore pipelines making up Line 5 violated the CWA and were

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## Fifth Claim for Relief
### (Violation of the National Environmental Policy Act by PHMSA)

114.    NWF re-alleges and incorporates by reference all the allegations set forth above.

115.    In approving the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, PHMSA violated NEPA and its implementing regulations by unlawfully withholding discrete action PHMSA was required to take first. In the alternative, PHMSA's approvals violated NEPA and its implementing regulations, and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

## Sixth Claim for Relief
### (Violation of the National Environmental Policy Act by the Secretary)

116.    NWF re-alleges and incorporates by reference all the allegations set forth above.

117.    In approving the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, the Secretary violated NEPA and its implementing regulations by unlawfully withholding discrete action PHMSA was required to take first. In the alternative, the Secretary's approvals violated

NEPA and its implementing regulations, and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

### Seventh Claim for Relief
(Violation of the Endangered Species Act – Inventory Requirement)

118.   NWF re-alleges and incorporates by reference all the allegations set forth above.

119.   In approving the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, PHMSA violated the inventory requirement established by the ESA and its implementing regulations by unlawfully withholding discrete action PHMSA was required to take first. In the alternative, PHMSA's approvals violated the inventory requirement established by the ESA and its implementing regulations, and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

### Eighth Claim for Relief
(Violation of the Endangered Species Act – Biological Assessment Requirement)

120.   NWF re-alleges and incorporates by reference all the allegations set forth above.

121.   In approving the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, PHMSA violated the biological

assessment requirement established by the ESA and its implementing regulations by unlawfully withholding discrete action PHMSA was required to take first. In the alternative, PHMSA's approvals violated the biological assessment requirement established by the ESA and its implementing regulations, and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

**Ninth Claim for Relief**
(<u>Violation of the Endangered Species Act – Consultation Requirement</u>)

122.   NWF re-alleges and incorporates by reference all the allegations set forth above.

123.   In approving the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, PHMSA violated the consultation requirement established by the ESA and its implementing regulations by unlawfully withholding discrete action PHMSA was required to take first. In the alternative, PHMSA's approvals violated the consultation requirement established by the ESA and its implementing regulations, and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff National Wildlife Federation respectfully requests that the Court grant the following relief:

A.     A declaratory judgment that PHMSA's approvals of the response plans submitted by Enbridge for the offshore pipelines making up Line 5 violated the CWA and were either not in accordance with law or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. In the alternative, a declaratory judgment that PHMSA's approvals of the response plans submitted by Enbridge for the offshore pipelines making up Line 5 violated the CWA and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

B.     A declaratory judgment that PHMSA's approvals of the response plans submitted by Enbridge for the onshore pipelines making up Line 5 violated the CWA and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

C.     A declaratory judgment that the Secretary's approvals of the response plans submitted by Enbridge for the offshore pipelines making up Line 5 violated the CWA and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

D.     A declaratory judgment that the Secretary's approvals of the response plans submitted by Enbridge for the onshore pipelines making up Line 5 violated the CWA and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

37

E.      A declaratory judgment that PHMSA's approvals of the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5 violated NEPA and its implementing regulations by unlawfully withholding discrete action PHMSA was required to take first. In the alternative, a declaratory judgment that PHMSA's approvals violated NEPA and its implementing regulations, and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law;

F.      A declaratory judgment that the Secretary's approvals of the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5 violated NEPA and its implementing regulations by unlawfully withholding discrete action the Secretary was required to take first. In the alternative, a declaratory judgment that the Secretary's approvals violated NEPA and its implementing regulations, and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law;

G.      A declaratory judgment that PHMSA's approvals of the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5, without first submitting to FWS (1) a written request for a list of any listed or proposed species or designated or proposed critical habitat that may be present in the area traversed by Line 5 or (2) a written notification of species and critical

38

habitat to be included in a biological assessment, violated the inventory

requirement established by the ESA and its implementing regulations by

unlawfully withholding discrete action PHMSA was required to take first. In the

alternative, a declaratory judgment that PHMSA's approvals violated the inventory

requirement established by the ESA and its implementing regulations, and were

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law, or without observance of procedure required by law;

     H.     A declaratory judgment that PHMSA's approvals of the response

plans submitted by Enbridge for the offshore and onshore pipelines making up

Line 5, without first conducting a biological assessment for the purpose of

identifying any endangered species or threatened species which is likely to be

affected by the approval, violated the biological assessment requirement

established by the ESA and its implementing regulations by unlawfully

withholding discrete action PHMSA was required to take first. In the alternative,

a declaratory judgment that PHMSA's approvals violated the inventory

requirement established by the ESA and its implementing regulations, and were

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law, or without observance of procedure required by law;

     I.     A declaratory judgment that PHMSA's approvals of the response

plans submitted by Enbridge for the offshore and onshore pipelines making up

Line 5, without first engaging in formal consultation with the FWS to insure that the approvals are not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat of such species, violated the consultation requirement established by the ESA and its implementing regulations by unlawfully withholding discrete action PHMSA was required to take first. In the alternative, a declaratory judgment that PHMSA's approvals violated the consultation requirement established by the ESA and its implementing regulations, and were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law;

J.      An order setting aside PHMSA's approvals of the response plans submitted by Enbridge for the offshore pipelines making up Line 5;

K.      An order setting aside PHMSA's approvals of the response plans submitted by Enbridge for the onshore pipelines making up Line 5;

L.      An order vacating PHMSA's approvals of the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5;

M.      An order setting aside the Secretary's approvals of the response plans submitted by Enbridge for the offshore pipelines making up Line 5;

N.      An order setting aside the Secretary's approvals of the response plans submitted by Enbridge for the onshore pipelines making up Line 5;

O.     An order vacating the Secretary's approvals of the response plans submitted by Enbridge for the offshore and onshore pipelines making up Line 5;

P.     An order entering an injunction (a) compelling the Secretary and PHMSA to comply with NEPA by preparing an EIS before approving response plans for the offshore and onshore pipelines making up Line 5 submitted by Enbridge, and (b) preventing irreparable harm to NWF and to the environment until the Secretary and PHMSA comply with the applicable mandatory requirements of NEPA and its implementing regulations;

Q.     An order entering an injunction (a) compelling PHMSA to comply with the ESA by initiating and completing the consultation process before approving response plans for the offshore and onshore pipelines making up Line 5 submitted by Enbridge, and (b) preventing irreparable harm to NWF and to the environment until PHMSA complies with the applicable mandatory requirements of ESA and its implementing regulations;

R.     An order retaining jurisdiction until PHMSA and the Secretary comply with the injunction entered by this Court;

S.     An order granting NWF costs of litigation (including reasonable attorney and expert witness fees) incurred in prosecuting this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the Endangered Species Act, 16 U.S.C. § 1540(g)(4); and

T.    Such other relief as this Court deems just and proper.

Respectfully submitted,

s/ Neil S. Kagan
Neil S. Kagan
National Wildlife Federation
801 Monroe Street
745 Legal Research
Ann Arbor, Michigan 48109
(734) 763-7087
Kagan@nwf.org
P58948