UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONAL WILDLIFE FEDERATION,

      Plaintiff,                            Case No. 17-10031

vs.                                     HON. MARK A. GOLDSMITH

SECRETARY OF THE DEPARTMENT
OF TRANSPORTATION, et al.,

      Defendants.
_____/

**OPINION & ORDER
(1) GRANTING IN PART AND DENYING IN PART PLAINTIFF NATIONAL
WILDLIFE FEDERATION'S MOTION FOR SUMMARY JUDGMENT (DKTS. 57 &
59); (2) GRANTING IN PART AND DENYING IN PART THE FEDERAL
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT (DKTS. 64 & 67);
AND (3) GRANTING IN PART AND DENYING IN PART DEFENDANT-INTERVENOR
ENBRIDGE'S CROSS MOTION FOR SUMMARY JUDGMENT (DKT. 68)**

This matter is before the Court on Plaintiff National Wildlife Federation's ("NWF")

Motion for Summary Judgment (Dkts. 57 & 59), Defendants the Secretary of the United States

Department of Transportation ("Secretary") and Administrator of the Pipeline and Hazardous

Materials Safety Administration's ("PHMSA") (collectively, "Federal Defendants") Cross-Motion

for Summary Judgment (Dkts. 64 & 67), and Defendant-Intervenor Enbridge Energy, Limited

Partnership's ("Enbridge") Cross-Motion for Summary Judgment (Dkt. 68).

In the Third Amended Complaint (Dkt. 34), NWF seeks review of PHMSA and Enbridge's

actions under the Administrative Procedure Act, 5 U.S.C. § 706(2) ("APA"), for alleged violations

of the Federal Water Pollution Control Act, commonly known as the Clean Water Act ("CWA");

the National Environmental Policy Act ("NEPA"); and the Endangered Species Act ("ESA").

Specifically, NWF seeks declaratory and injunctive relief related to PHMSA's approvals of

1

Enbridge's facility response plans for an oil pipeline known as Line 5.  3d Am. Compl., Prayer for Relief.

NWF argues that PHMSA's interpretation of the Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 (1990), which amended the CWA, is arbitrary and capricious in regards to the type of facility at issue in this case.  It further argues that PHMSA acted improperly by approving Defendant-Intervenor Enbridge's oil spill response plans without sufficient explanation in violation of the CWA.  And finally, NWF argues that PHMSA failed to meet its statutory obligations by approving the oil spill response plans without first complying with their duties under NEPA and the ESA.  For the reasons discussed below, the Court grants in part and denies in part NWF's motion for summary judgment and grants in part and denies in part Defendants' respective cross-motions for summary judgment.

## I.      BACKGROUND

This is the second time this case has come before this Court.  In the prior case, National Wildlife Federation v. Secretary of United States Department of Transportation ("NWF I"), 286 F. Supp. 3d 836, (E.D. Mich. 2017), NWF argued, among other things, that PHMSA was improperly reviewing facility response plans for some two decades under federal regulations for onshore pipelines, which it maintained did not faithfully track the CWA.  Id. at 841.  The Court dismissed the case on standing grounds.  Id. at 846.  The Court reasoned that a judgment in NWF's favor requiring PHMSA to follow the CWA, rather than its regulations, would not redress NWF's claimed injuries, because whether the Secretary was following the CWA or the federal regulations, the results would have been the same.  Id.  Because NWF could not satisfy the redressability requirement to establish standing, the Secretary's cross-motion for summary judgment was granted.  Id.

2

The present case concerns another challenge to the spill response plan approval process, albeit a narrower one.  Instead of challenging the approval of every spill response plan for every oil pipeline in the last two decades, NWF is now challenging only the approval of two spill response plans for a pipeline known as Line 5 – a 30-inch-diameter pipeline that was constructed in 1953.  It spans 641 miles beginning in Superior, Wisconsin, passing through Michigan's Upper Peninsula, under the Straits of Mackinac, through Michigan's Lower Peninsula, and across the St. Clair River, to Sarnia, Ontario, Canada.  Enbridge Answer ¶¶ 2, 42, 80-81 (Dkt. 36); Fed. Def. Answer ¶¶ 83, 86 (Dkt. 35).  The Straits of Mackinac are a six-mile-long section of water that joins Lake Michigan and Lake Huron into a single hydraulic system.  NWF Mot. ¶ 3.  It is spanned at its narrowest point (four miles) by the Mackinac Bridge, which connects Michigan's Upper and Lower peninsulas.  Id.  The portion of Line 5 that crosses the Straits of Mackinac splits into two submerged 20-inch-diameter pipelines running parallel to the Mackinac Bridge.

Although one has never occurred, an oil spill in the Straits of Mackinac poses a significant threat to Lake Michigan and Lake Huron.  The currents in the Straits can be quite strong and tend to reverse direction every few days.  David J. Schwab Decl., Ex. 1. to NWF Mot. to Amend, at PageID.865.  According to a recent study, because of the reversing currents, an oil spill in the Straits is almost equally likely to be found east or west of the Straits, and could travel as far as nine miles in either direction.  Id. ¶ 6.  More than 700 miles of shoreline in Lakes Michigan and Huron are potentially vulnerable to an oil spill in the Straits.  Id. ¶¶ 13-18.

To avoid such ecological disasters, legislative and regulatory measures have been adopted. A year after the 1989 Exxon Valdez spill, the Oil Protection Act, which amended section 311 of the CWA, was enacted, with the goal of preventing another such tragedy by prohibiting owners and operators of certain oil facilities from transporting oil unless they had a spill response plan

approved by the President.  See 33 U.S.C. § 1321(j)(5)(F)(i)-(ii).

The President delegated his authority under the CWA — to issue regulations and review and approve response plans — to different executive branch departments.  See Executive Order No. 12777, 56 Fed. Reg. 54,757 (Oct. 18, 1991).  He delegated to the Department of Transportation ("DOT") his responsibilities regarding "transportation-related onshore facilities."  Id.  The President delegated to the Department of the Interior ("DOI") his responsibilities regarding "offshore facilities."  Id.

In 1993, the Secretary re-delegated authority for onshore facilities to an agency within DOT, the Research and Special Programs Administration ("RSPA") — which authority was delegated once again, in 2005, to RSPA's successor within DOT, PHMSA.  See 49 C.F.R. § 1.97.  In 1993, RSPA issued regulations denominated as "onshore" regulations.  58 Fed. Reg. 244 (codified at 49 C.F.R. Part 194).  In addition to addressing land segments of oil pipelines, the regulations include references to those segments of pipelines that cross inland waters.  See, e.g., 49 C.F.R. § 194.115.

At the same time, DOI issued an Interim Final Rule, 58 Fed. Reg. 7489-01 (February 8, 1993), which established "requirements for spill-response plans for offshore facilities including associated pipelines."  The rule was meant to provide guidance to pipeline operators who were soon required to submit certain spill response plans to DOI.  The interim final rule included proposed regulations, which defined the term "offshore" as "the area seaward of the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the area seaward of the line marking the limit of inland waters."  Id.

Because Executive Order 12777 had expanded DOI's traditional role of regulating facilities on the Outer Continental Shelf, the department subsequently delegated its responsibilities

4

regarding spill prevention to DOT and the Environmental Protection Agency ("EPA").  In a 1994 memorandum of understanding, DOI delegated to EPA "responsibility for non-transportation-related offshore facilities located landward of the coast line," and delegated to DOT "responsibility for transportation-related facilities, including pipelines, located landward of the coast line."  40 C.F.R. § Pt. 112, App. B.

Since that time, both RSPA and PHMSA have reviewed response plans for pipelines situated landward of the Nation's coasts, without challenge to their authority or the propriety of their actions, until NWF I was filed.  After NWF I was initiated, the Secretary ratified RSPA's and PHMSA's approvals, including plans "covering pipeline segments located in, on, or under inland waters . . ."  NWF I, 286 F. Supp. 3d at 840.  The Secretary also delegated to PHMSA "any and all pipeline-related authority" previously delegated to DOT either through the Executive Order or the Memorandum of Understanding.  Id.

As noted above, this case involves two response plans.  Under federal regulations, pipeline operators are required to submit a response plan for "a geographic area either along a length of pipeline or including multiple pipelines, containing one or more adjacent line sections, for which the operator must plan for the deployment of, and provide, spill response capabilities."  49 C.F.R. § 194.5.  "The size of the zone is determined by the operator after considering available capability, resources, and geographic characteristics."  Id.

PHMSA approved Enbridge's response plan for the Superior Region Response Zone on July 6, 2015 (the "2015 Superior Plan"); this plan covered a response zone that "begins at the Canadian border near Neche, North Dakota and continues across northern Minnesota into Wisconsin and Michigan."[1]  The small portion that covers Michigan includes certain segments of

---

[1] PHMSA005277.

Line 5.[2] PHMSA also approved Enbridge's response plan for the Great Lakes Region Response Zone on June 7, 2017 (the "2017 Great Lakes Plan").[3] The Great Lakes zone covers the rest of Michigan and covers portions of Illinois, Wisconsin, Ohio, Indiana, and New York.[4] The 2017 Great Lakes Plan covers all of Line 5 located in Michigan.[5]

_____

[2] See PHMSA005760 (approval letter); PHMSA005277.

[3] See PHMSA008999 (approval letter); PHMSA008262.

[4] PHMSA008261-PHMSA008265.

[5] PHMSA008264-8298. Both response plans have since been superseded. Nonetheless, the parties agree that the matter is not moot because the interval between response plan iterations makes the matter subject to the "capable of repetition yet evading review" exception to mootness. Honig v. Doe, 484 U.S. 305, 318-319 (1988); Libertarian Party of Ohio v. Blackwell, 462 F.3d 579, 584 (6th Cir. 2006). NWF Mot. at 20-21 n.13; Fed. Def. Mot. at 10 n.1; Enbridge Mot. at 12-13.

However, with respect to the Superior Response Plan, Defendants also make a cursory standing argument. See Federal Def. Mot. 10 n.1; Enbridge Mot. at 12-13 (incorporating Federal Defendants' argument, although erroneously characterizing it as a mootness argument). The argument goes that because the current Superior Response Plan covers only those portions of Line 5 that are located in Wisconsin, NWF members, whose injuries are confined to Michigan, lack standing to challenge the plan. Id. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000). NWF sets forth its position on standing in its opening brief, but does not specifically address Defendants' perfunctory standing argument in its response brief. Nonetheless, standing is a jurisdictional issue and federal courts have an independent duty to determine whether they have jurisdiction. Heartwood, Inc. v. Agpaoa, 628 F.3d 261, 266 (6th Cir. 2010).

The Court finds that NWF member Francesca J. Cuthbert would have standing because she would suffer an injury from an oil spill in Wisconsin. Cuthbert, a Professor in the Department of Fisheries, Wildlife and Conservation Biology at the University of Minnesota, has spent more than thirty years researching avian biology and conservation, with a particular focus on the Great Lakes population of the piping plover. Francesca J. Cuthbert Decl., Ex. 7 to NWF Mot., ¶¶ 6-20 (Dkt. 57-8). The piping plover was listed as endangered in 1985. Id. ¶ 14. At that time, only twelve to seventeen pairs existed in the Great Lakes region, all within Michigan borders. Id. Since 1985, however, the Great Lakes piping plover population has increased and now includes populations in Wisconsin. Id. Because the Superior Plan covers a portion of Line 5 in Wisconsin, the piping plover population and their habitat could be impacted greatly by an oil spill due to an insufficient

NWF asserts that the Federal Defendants have misclassified Line 5 as a single-onshore facility and failed to follow the requirements set forth in the CWA by approving without sufficient explanation the 2015 Superior Plan and 2017 Great Lakes Plan (collectively, "Response Plans") submitted by Enbridge.  Additionally, NWF maintains that the Federal Defendants failed to follow statutory requirements by approving the Response Plans without first complying with their mandatory duties under NEPA and the ESA.

## II.   STANDARDS OF DECISION

Under the APA, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  Under Federal Rule of Civil Procedure 56, a court typically grants "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Sixth Circuit has noted that the summary judgment standard may not be appropriate when it comes to judicial review of an agency's action under the APA.  Alexander v. Merit Sys. Protection Bd., 165 F.3d 474, 480-481 (6th Cir. 1999).  This is because a motion for summary judgment "invites improper consideration of evidence outside the administrative record and reliance upon post hoc rationalizations for the agency's action."  Id. at 480.  Nevertheless, a court "may enter judgment in response to a motion for summary judgment so long as the proper standard of review is used."  Taco Especial v. Napolitano, 696 F. Supp. 2d 873, 877 (E.D. Mich. 2010).  Put another way,

---

response plan.  Cuthbert would suffer a loss of the subject of her extensive environmental research, an injury sufficient to confer standing.  See United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 686-689, (1973) (finding that aesthetic and environmental injuries are sufficient for standing so long as the plaintiff suffers the harm personally).  Because Cuthbert, an NWF member, would have standing to sue in her own right, NWF has associational standing to challenge the Superior Plan.

summary judgment "serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." Resolute Forest Prod., Inc. v. U.S. Dep't of Agric., 187 F. Supp. 3d 100, 106 (D.D.C. 2016).

### III.    ANALYSIS

NWF makes three arguments in its motion for summary judgment.  First, it argues that the Federal Defendants' approvals of the Enbridge Response Plans were arbitrary and capricious because they did not comply with the CWA as amended by the OPA, specifically with respect to its interpretation of "onshore" facility.  Second, NWF argues that the Federal Defendants' approvals of the Enbridge Response Plans were arbitrary and capricious because PHMSA failed to sufficiently explain the bases for the approvals.  Third, it argues that because PHMSA has discretion to approve response plans under the CWA, PHMSA was required, under NEPA, to prepare an environmental impact statement and, under the ESA, to consult with the appropriate federal agencies to ensure that listed endangered species and their habitats would not be jeopardized.  The Court will take each argument in turn.

### A.  The CWA's Response Plan Requirements

NWF argues that PHMSA's approval of the Response Plans was arbitrary and capricious because PHMSA incorrectly considers Line 5 a single "onshore facility" under the CWA.  It further argues that even if Line 5 is considered a single onshore facility, PHMSA's Response Plan approvals were deficient.

### 1.  Onshore and Offshore Facilities

The parties disagree about whether an oil pipeline should be considered a single "onshore" facility, as Defendants contend, or numerous "onshore" and "offshore" facilities, as NWF

contends.  If NWF is correct, the Federal Defendants acted improperly in approving a single response plan in each response zone, instead of insisting on response plans for most onshore and all offshore segments.  As noted in NWF I, the CWA does not expressly address whether interconnected pipelines over both land and water should be viewed as embracing a single facility – and characterized as solely onshore or offshore – or whether they should be viewed as a collection of different facilities with separate land and water segments.  NWF I, 286 F. Supp. 3d at 839. According to NWF, interconnected pipelines consist of two kinds of facilities; the land portion is an onshore facility, while the portion in or over water is offshore.  NWF Mot. at 20-23.  The Federal Defendants contend that the entire network of pipelines, both the portion that traverses land and the portion that traverses water, is an onshore facility under the CWA.  Fed. Def. Cross-Mot. at 12.  If NWF's interpretation is correct, every stretch of pipeline that transitions from onshore to offshore would be considered a new facility requiring its own response plan, which for Line 5 could be more than a hundred unique response plans.  If the Federal Defendants are correct, only one response plan would be required for a given geographic region, which for Line 5 would be two response plans.

Because the parties' conflicting interpretations of the CWA indicate that the statute may be ambiguous, the Court must review the matter under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  The first step under Chevron is to determine whether Congress has "directly spoken to the precise question at issue."  Id. at 842.  "If the statute is unambiguous, then Congress has spoken to the precise question at issue," which ends the matter. Sunrise Coop., Inc. v. United States Dep't of Agric., 891 F.3d 652, 656 (6th Cir. 2018).  "If, however, the statute is ambiguous, [courts] defer to the agency's interpretation, provided that interpretation was promulgated via notice-and-comment rulemaking or a formal adjudication, and

provided it is reasonable." Sierra Club v. ICG Hazard, LLC, 781 F.3d 281, 287 (6th Cir. 2015) (citing Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000); Chevron, 467 U.S. at 843).

The CWA requires an owner or operator of a facility "to prepare and submit to the President a plan for responding, to the maximum extent practicable, to a worst case discharge ["WCD"], and to a substantial threat of such a discharge, of oil or a hazardous substance." 33 U.S.C. § 1321(j)(5)(A)(i). A "'facility' means any structure [or] group of structures . . . which is used for . . . storing, handling, transferring, processing, or transporting oil. This term includes any . . . pipeline used for one or more of these purposes." 33 U.S.C. § 2701(9).

Facilities include both offshore facilities and onshore facilities. 33 U.S.C. § 1321(j)(5)(C)(iii-iv). "Offshore" facilities are defined as facilities located under navigable waters of the United States, while "onshore" facilities are defined as "any facility . . . of any kind located in, on, or under, any land within the United States other than submerged land." 33 U.S.C. § 1321(a)(10)-(11). While response plans are required for all offshore facilities, the same is not true for onshore facilities. Regarding onshore facilities, the response plan requirement applies only to "an onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters." 33 U.S.C. § 1321 (j)(5)(C)(iii)-(iv).

The Court finds the CWA is ambiguous with respect to onshore facilities that cross navigable waters. As Defendants point out correctly, the CWA defines a pipeline as a single facility, even if it is made up of a group of structures. 33 U.S.C. § 2701(9). The ambiguity is created by the CWA's distinction between onshore and offshore facilities, without specifying the response-plan consequence for a single land-based oil pipeline that crosses inland waters. Therefore, an ambiguity exits.

10

NWF does not challenge that PHMSA's interpretation was promulgated via notice-and-comment rulemaking or through a formal adjudication.  Therefore, the remaining question at issue is whether PHMSA's interpretation of an onshore facility that crosses navigable waters is reasonable.  The Court finds that it is.

PHMSA interprets oil pipelines as single onshore facilities inclusive of all segments, even those that cross navigable waters.  Fed. Def. Mot. at 14.  In other words, an oil pipeline is a single facility defined by its beginning and end points of oil transportation.  Id. at 13.  This is a reasonable interpretation of the CWA's definition of "facility," which "means any structure [or] group of structures . . . used for . . . transporting oil," including oil pipelines.  33 U.S.C. § 2701(9).

 PHMSA's definition also makes sense from a practical perspective.  A single response plan, or in this case two response plans, will likely promote a timely and efficient response to a spill, by avoiding the need to identify and implement every plan that might be impacted in the frantic initial effort to contain and thwart migration of a spill.

Furthermore, whether an oil pipeline is characterized as a single onshore facility or a collection of both onshore and offshore facilities does not change the CWA's requirements.  The CWA explicitly requires response plans for onshore facilities that "could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters." 33 U.S.C. § 1321 (j)(5)(C)(iii)-(iv).  There are not unique response plan requirements based on whether a facility is onshore or offshore.  As the Court previously observed, the CWA sets forth a unitary set of response plan requirements, regardless of whether the response plan is directed to an onshore or offshore facility.  NWF I, 286 F. Supp. 3d at 845 (citing 33 U.S.C. § 1321(j)(5)(D)).  In such circumstances, it would be redundant and not advance any sound regulatory purpose to require multiple plans for various segments of a pipeline.  PHMSA's interpretation of oil pipelines

that cross navigable waters as single onshore facilities is reasonable within the meaning of the CWA.

Because there is an ambiguity in the CWA with respect to response plan requirements for pipelines, the Court must defer to the Federal Defendants' reasonable reading of the CWA. Sierra Club, 781 F.3d at 287. The Court can find no fault with the Federal Defendants' refusal to insist on separate response plans for each land and water segment. Defendants' motions are granted and NWF's motion is denied in this respect.

### 2. Response Plan Requirements

#### (i) Locations

NWF argues that even if Line 5 is considered one onshore facility, the Response Plans still do not satisfy the CWA's requirements. NWF Mot. at 26. NWF argues that both response plans calculate the WCD at facilities that are a significant distance away from Line 5, which it says is improper. Id. at 24, 26-27.

The CWA requires response plans to, among other things,

(iii)   identify, and ensure by contract or other means approved by the President the availability of, private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge (including a discharge resulting from fire or explosion), and to mitigate or prevent a substantial threat of such a discharge;

(iv)   describe the training, equipment testing, periodic unannounced drills, and response actions of persons on the vessel or at the facility, to be carried out under the plan to ensure the safety of the vessel or facility and to mitigate or prevent the discharge, or the substantial threat of a discharge;

33 U.S.C. § 1321(j)(5)(D)(iii & iv).

NWF is mistaken that the Response Plans are deficient because they consider the WCD at facilities remote to Line 5. NWF argues that qualitatively the most significant risk of harm to navigable waters in the response zones are the pipes running parallel to the Mackinac Bridge and

the pipe segments crossing the Saginaw and St. Clair Rivers. NWF Mot. at 24. However, the CWA defines WCD as the location of the "the largest foreseeable discharge in adverse weather conditions." 33 U.S.C. § 1321(a)(24)(B). The implementing regulations require operators to "determine the worst case discharge for each of its response zones and provide the methodology, including calculations, used to arrive at the volume." 49 C.F.R. § 194.105(a). Under the regulations, "the largest volume, in barrels" is calculated at the largest discharge from a pipeline segment, the largest historic discharge area, or the size of the largest breakout tank(s) in the geographic area covered by the response plans. 49 C.F.R. § 194.105(b). The CWA and the regulations in this respect are quantitative, rather than qualitative.

The Response Plans identify facilities within the respective response zones where the largest volume of oil could be released. The Response Plans provide the methodology and the calculations used to determine the locations of the WCDs.[6] NWF has not explained why as a quantitative matter, Enbridge's calculations are incorrect. Instead, NWF attempts to confuse the matter by equating "worst case discharge," which under the regulations relates to the largest volume of oil, with a "worst case scenario," which it would argue is an oil spill in the Straits of Mackinac or in the Saginaw and St. Clair Rivers. There is no basis in the regulations for NWF's qualitative argument that areas other than the ones identified in the Response Plans should be identified as the WCDs in the Response Plans. The Response Plans identify the locations of the potential WCDs within the meaning of the federal regulations. Accordingly, there is nothing deficient with the Response Plans with respect to the locations identified as sites for a potential WCDs.

**(ii) Equipment**

---

[6] PHMSA005045 & 005302; PHMSA008282 & 008988.

NWF further argues that the Response Plans do not explain what specific equipment and response actions Enbridge has determined are necessary to ensure the safety of the facility and to mitigate or prevent WCD at the identified locations, especially in adverse weather conditions. NWF Mot. at 27-28. Defendants make two arguments in response. The Federal Defendants argue the Response Plans meet the CWA requirements because Enbridge contracted with Oil Spill Removal Organizations ("OSROs") that have received WCD classifications from the United States Coast Guard. Fed. Def. Mot. at 22. They assert that a WCD classification represents the Coast Guard's expert judgment that an OSRO has the necessary resources to respond to a WCD in adverse weather conditions in a particular geographic area. Id.[7] The Federal Defendants and Enbridge also argue that all of the required details are present in the Response Plans.

The Federal Defendants' first argument cannot be reconciled with the CWA's requirements. The CWA's response plan requirements are explicit. The CWA requires a response plan to ensure the removal, to the maximum extent practicable, of the largest foreseeable discharge in adverse weather conditions, and to mitigate or prevent a substantial threat of the largest foreseeable discharge in adverse weather conditions. 33 U.S.C. § 1321(a)(24), (j)(5)(D)(iii)-(iv); see also 49 C.F.R. § 194.105(a). The statute requires pipeline operators to identify, among other things, "equipment necessary to remove to the maximum extent practicable a [WCD]" of oil or other hazardous substances. 33 U.S.C. § 1321(j)(5)(D)(iii). It further requires operators to describe, among other things, the "response actions of persons . . . at the facility, to be carried out

---

[7] This is consistent with PHMSA's comments made when finalizing its response plan regulations, where it explained that "[a]n operator contracting with USCG-classified OSROs in order to have sufficient response resources to respond to the worst case discharge will not have to describe the response resources or the response equipment maintenance program of the USCG-Classified OSROs." Pipeline Safety: Response Plans for Onshore Transportation-Related Oil Pipelines, 70 FR 8734-01.

under the plan to ensure the safety of the . . . facility and to mitigate or prevent the discharge, or the substantial threat of a discharge." 33 U.S.C. § 1321(j)(5)(D)(iv). PHMSA has recognized as much in implementing its regulations. In finalizing its response plan regulations, PHMSA explained the following:

> each response plan must include a core plan that provides an information summary (e.g., operator address; description of response zones; contact information for designated spill response manager), and additional detail on immediate notification procedures; spill detection and mitigation procedures; the applicable response organization; response activities and response resources; government agencies that will provide support; training procedures; equipment testing; drill types, schedules, and procedures; and plan review and update procedures.

Pipeline Safety: Response Plans for Onshore Transportation-Related Oil Pipelines, 70 FR 8734-01 (emphasis added).

As noted above, one of the driving forces behind OPA was the Exxon Valdez oil spill, which discharged almost eleven million gallons of oil into Prince William Sound in the Gulf of Alaska. At that time, there were not enough dispersants, skimmers, and containment booms available to mitigate and control the oil spread, which eventually reached shorelines and caused significant and ongoing environmental damage. Response plans under the CWA are a direct response to the shortcomings of the response to the Exxon Valdez spill in 1989. See 33 U.S.C. § 2731 (Section 5001 of OPA authorized the creation of a Prince William Sound Oil Spill Recovery Institute, with a mission to "identify and develop the best available techniques for preventing and responding to oil spills in the Arctic and sub-Arctic.").

It is not enough that the United States Coast Guard qualifies that an OSRO has sufficient resources to address a WCD in a given response zone. The response plan itself, as required by the CWA, must identify resources available and strategies to be implemented in the event of an oil discharge into or around navigable waters. In some instances, the operator of an oil pipeline is

required to respond to an oil spill in a matter of hours.  49 C.F.R. § 194.115(b).  A response plan is the comprehensive document that details the resources and strategies for the personnel implementing the response plans under tight time constraints.  The Coast Guard's certification cannot serve as a proxy for statutory requirements.  The Federal Defendants' first argument is without merit.

The Federal Defendants' second argument, however, which Enbridge joins, has more teeth. They argue that the Response Plans comply with the CWA and federal regulations by addressing necessary equipment and response actions.  Fed. Def. Mot. at 22-23; Enbridge Mot. at 24-25. Annex 1.7 to the respective Response Plans describe Enbridge's local spill response equipment in detail.[8]  Enbridge has a master service agreement with a number of OSROs, and their equipment is detailed in Annex 2.[9]  The Response Plans provide maps showing the location of response resources and the response times.[10]  The Response Plans further provide guidance on emergency response and management during an incident.[11]  And the Response Plans purport to have appropriate equipment to operate in adverse weather conditions and respond to a WCD.[12]

NWF argues that the guidance in the Response Plans is merely general in nature and fails to provide specific action plans.  NWF Mot. at 27.  NWF is mistaken.  The Response Plans each begin with an overview setting forth objectives in order of importance and specific strategies to

---

[8] PHMSA005290-PHMSA005300; PHMSA008272-PHMSA008278.

[9] See PHMSA005650-PHMSA005653; PHMSA008931-PHMSA008939.

[10] See PHMSA005318-PHMSA005357; PHMSA008334-PHMSA008350.

[11] PHMSA005069-PHMSA005070; PHMSA008038-PHMSA008039.

[12] PHMSA005313; PHMSA008293; see also PHMSA005045 (noting the WCD calculation "yields a conservative estimate of the worst-case discharge volume regardless of weather conditions"); PHMSA008988 (same).

meet those objectives.   The Response Plans then provide more than a hundred pages of comprehensive response protocols and response actions.[13]

NWF does not explain what is defective in these protocols and response actions other than to say that they lack a certain level of detail.  The Response Plans contain information directed at each of the relevant requirements under 33 U.S.C. § 1321(j)(5)(D)(i-iv).  Whether the Response Plans are sufficient "to ensure the removal, to the maximum extent practicable, of the largest foreseeable discharge in adverse weather conditions, and to mitigate or prevent a substantial threat of the largest foreseeable discharge in adverse weather conditions" is a separate matter.  33 U.S.C. §§ 1321(a)(24), (j)(5)(D)(iii)-(iv).  PHMSA is in the best position to evaluate the sufficiency of the Response Plans and the Court must rely on its review in this regard, absent specific challenges by NWF, which have not been mounted.  Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992); accord Cherokee Forest Voices, 182 F. App'x at 493.  Therefore, the Response Plans are not deficient for insufficient content.

### B.  Were Federal Defendants' approvals arbitrary and capricious because they failed to explain the approvals?

NWF argues that PHMSA acted arbitrarily and capriciously because it did not explain its decisions to approve Enbridge's Response Plans.  NWF Mot. at 29.  The Federal Defendants contend that PHMSA followed its response plan review process, which it argues is satisfactory under the CWA.  Id. at 16-18.  Enbridge agrees and asserts that the administrative record details PHMSA's efforts to confirm that the Response Plans satisfy the response planning criteria specified under Section 311(j)(5)(D).  Enbridge Mot. at 26-27.  NWF has the better part of the argument.

The APA requires courts to "hold unlawful and set aside agency action, findings, and

---

[13] See PHMSA005069-PHMSA005181; PHMSA008038-PHMSA008161.

conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In reviewing agency action under this narrow and deferential standard, courts examine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Judulang v. Holder, 565 U.S. 42, 53 (2011).  "This is not an invitation for judicial second-guessing.  [Courts] ask not whether the agency's decision was right but whether as a matter of process we can 'reasonably discern' why the agency did what it did and whether as a matter of substance that decision was not arbitrary."  Kentucky Coal Ass'n, Inc. v. Tennessee Valley Auth., 804 F.3d 799, 801 (6th Cir. 2015) (some internal marks omitted) (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513-514 (2009)).  So long as the agency examined "the relevant [considerations] and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," courts will not set aside its decision.  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).[14]

Further, courts "should accept the agency's factual findings if those findings are supported by substantial evidence on the record as a whole."  Arkansas, 503 U.S. at 113 (emphasis in original); accord Cherokee Forest Voices v. United States Forest Serv., 182 F. App'x 488, 493 (6th Cir. 2006).  An agency's decision is arbitrary and capricious where the agency

_____

[14] The Court takes the facts from the administrative record.  In actions seeking review under the APA, a court's review is confined to the "whole record or those parts of it cited by a party." 5 U.S.C. § 706.  "Although the review is confined to the administrative record, the Court may consult documents outside the record, such as the declarations submitted by the plaintiffs, to determine if there is any information the agency should have considered but did not."  Anglers of the Au Sable v. U.S. Forest Serv., 565 F. Supp. 2d 812, 822 (E.D. Mich. 2008) (citing Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir. 1980) & Thompson v. United States Dep't of Labor, 885 F.2d 551, 555 (9th Cir. 1989)).  The Federal Defendants filed the original administrative record on October 5, 2017 (Dkt. 33); an amended administrative record was filed on January 8, 2018 (Dkt. 42); and a second amended administrative record was filed on May 9, 2018 (Dkt. 62).

> relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007); Bangura v. Hansen, 434 F.3d 487, 502 (6th Cir. 2006) ("An agency decision is arbitrary and capricious if the agency fails to examine relevant evidence or articulate a satisfactory explanation for the decision.").

A court must not "substitute its judgment for that of the agency," Judulang, 565 U.S. at 53, and it cannot "reweigh the evidence" if the agency's "conclusion was reasonable," El Conejo Americano of Texas, Inc. v. Dep't of Transp., 278 F.3d 17, 20 (D.C. Cir. 2002).  Courts should uphold an agency's decision, even if the decision is of less-than-ideal clarity, "if the agency's path may reasonably be discerned."  Fox Television Stations, Inc., 556 U.S. at 513-514.

"'Nevertheless, merely because [a court's] review must be deferential does not mean that [it] must also be inconsequential.'"  Kentucky Waterways All. v. Johnson, 540 F.3d 466, 474 (6th Cir. 2008) (quoting Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005)).  "The arbitrary-and-capricious standard . . . does not require [courts] merely to rubber stamp the [agency's] decision." Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (6th Cir. 2004).

PHMSA did not articulate a satisfactory explanation for its decision to approve the Response Plans.  PHMSA's review process was conducted using a standard set of regulatory review criteria. Fed. Def. Mot. at 17.  Two PHMSA reviewers addressed the criteria using standard worksheets.[15]  The worksheets are broken down by regulatory requirements and present checklist-

---

[15] PHMSA005719-005759; PHMSA006911-006920, PHMSA007950-007966.

type questions to which reviewers may respond.[16]  For example, the first category asks the following:

> Is the pipeline described in the Plan jurisdictional to PHMSA's Part 194 jurisdiction?

> Score ACCEPTABLE if the Plan includes Part 194 jurisdictional elements (onshore pipelines/breakout tanks). If the reviewer believes that the facility described in the Plan is not jurisdictional to PHMSA Part 194 regulations please notify HQ personnel.

PHMSA005719 (citing 49 C.F.R. § 194.101).  In response to the above prompt, the reviewer noted that the primary finding was "Acceptable," cited the location in the plan where the information was found, and answered the question in the comments section with "Yes."  Id.  Most of the questions are answered with a simple yes in the comments section.  While a simple yes may suffice for answering jurisdictional question, not so for other criteria.  For example, question eighteen asks the following:

> Does the Plan include procedures for responding, to the maximum extent practicable, to a worst case discharge?

> Comments: Yes.

PHMSA005724 (citing 49 C.F.R. § 194.107(a)).  The direction to the reviewer is to score this criterion unsatisfactory if response procedures are not adequate for responding to a WCD.  The reviewer noted the locations in the response plan where the information could be found, but the reviewer offers no explanation of why these procedures are adequate.  Similarly, in question twenty, citing 49 C.F.R. § 194.107(c)(1)(v), the prompt asks, "Does the plan include response activities?  Comment: Yes."  PHMSA005725.  But section 194.107(c)(1)(v) says that response plans must include a core plan which includes "Response activities and response resources."  There

---

[16] See, e.g., PHMSA005719.

is no explanation of why the response activities in the response plan are adequate and there is no

mention of response resources.  Resources are mentioned under question twenty-five, but simply

finds the plan provides "the appropriate response resources," without further explanation.[17]

Occasionally, the reviewers answer yes with cursory or conclusory statements that the

particular criterion was met.  For example, question sixteen says the following:

> Does the Plan show the methodology and calculations the operator used to
> determine the Worst Case Discharge, based on the pipeline, breakout tank, and
> historic discharge components, for each Response Zone in the Plan?
>
> Comments: Yes; pipeline, max historic discharge and BOT all addressed
> appropriately.

PHMSA005723 (citing 49 C.F.R. § 194.105(a)).  The section says the reviewer should score this

criterion as unsatisfactory if the calculations are wrong or cannot be followed, which suggests a

detailed review.  However, it is difficult to discern whether a detailed review was conducted when

the conclusion is simply that everything was "addressed appropriately."  Additionally, the section

requires the reviewer to note in the "comments section the sum of the 'response time' and

'shutdown time' from the pipeline WCD calculation," which is not in the comment section.

A similarly cursory response is made to question twenty-three:

> Does the Plan establish provisions to ensure the protection of safety at the response
> site?
>
> Comments: Yes; Site Safety and Health Plan required and Safety Officer discussed
> throughout the Plan (responsibilities on PDF pg. 89).

PHMSA005726 (citing 49 C.F.R. § 194.107(b)(1)(ii)).  The reviewer says that subject matter was

discussed throughout the plan, but not why it was sufficient to the task of ensuring the protection

of safety at the response site.

No deficiencies were found with the 2015 Superior Plan, therefore a standard letter of

---

[17] PHMSA005735.

approval was issued stating the following:

> The Pipeline and Hazardous Materials Safety Administration (PHMSA) has received and reviewed Enbridge (U.S.). Inc.'s oil spill response plan for the Superior Region Response Zone dated May 2015.  We conclude that the Plan complies with PHMSA's regulations concerning onshore oil pipelines found at 49 Code of Federal Regulations (CFR) Part 194.  Your Response Plan has been approved.
>
> This approval is valid for five years from the date of this letter.  You must revise and resubmit a Response Plan for approval by July 6, 2020.  If discrepancies are found during PHMSA inspections, or if new or different operating conditions or information would substantially affect the implementation of this plan, you will be required to resubmit a revised plan.  See 49 CFR § 194.121(b).
>
> Should you have any questions or concerns, please contact me at (202) 366-4595 or by email at PHMSA.OPA90@dot.gov.  Please include the sequence number and your PHMSA Operator Identification Number on any future correspondence.

PHMSA005760; see also Fed. Def. Mot. at 18 (noting that if response plans contain all the required elements, PHMSA issues a letter of approval).  Some deficiencies were found in the 2017 Great Lakes Plan, for which PHMSA issued a letter of correction explaining that the plan could not be approved without correcting the deficiencies.[18]  A revised response plan was submitted by Enbridge, and after further review,[19] PHMSA issued an approval letter largely tracking the 2015 Superior Plan approval letter.[20]

NWF argues that PHMSA's explanation for its approvals were deficient and analogizes to Sierra Club v. Mainella, 459 F. Supp. 2d 76, 100 (D.D.C. 2006).  NWF Mot. at 29.  In Mainella, the National Park Service permitted drilling near Big Thicket National Preserve.  Id. at 79.  The National Park Service regulates private oil and gas drilling operations within and around the

---

[18] PHMSA007967-007968.

[19] PHMSA008996-008998.

[20] See PHMSA008999.

National Park System.  Id.  The National Park Service approved an operator's plan to drill for oil in an area that could potentially impact the preserve.  Id. at 82.  In its approval letters, the National Park Service merely described the impact of the oil well and reached a conclusion, without explanation, that the oil well would not impair park resources.  Id. at 100-101.  The Mainella court explained that it "is insufficient, [to] merely set[] forth the facts found and the choice made, without revealing the rational connection – the agency's rationale for finding that the impact described is not impairment."  Id. at 100 (internal marks omitted).

Defendants attempt to pivot and argue that here, as in Mainella, the Court should look to the administrative record as a whole to determine if PHMSA's decisions were adequately explained.  Fed. Def. Mot. at 23; Enbridge Mot. at 26-27.  Defendants argue that the respective checklists explain adequately the bases for PHMSA's approvals when reviewed in conjunction with the relevant pages in the Response Plans.  Id.  Enbridge notes that the Supreme Court has found "skeletal orders" issued by the EPA under the Clean Air Act to be adequate to explain the EPA's approval of mining permits.  Id. at 27 (citing Alaska Dep't of Env't Conservation v. EPA, 540 U.S. 461, 497 (2004)).  Defendants miss the mark.

In Alaska Department, the Supreme Court found the EPA's skeletal orders were sufficient when considered with the EPA's explanatory correspondences.  540 U.S. at 465.  Here, unlike Alaska Department, there is nothing in the administrative record explaining why the Response Plans were sufficient to meet the CWA's requirements.  The cursory responses made in the standardized worksheet comments section, often containing a single word, are not explanations. It is not enough that PHMSA personnel reviewed the Response Plans and identified page ranges where the reviewed information exists.  Federal agencies must "examine the relevant data and articulate a satisfactory explanation for its action."  Kentucky Coal Ass'n, 804 F.3d at 801

(emphasis added) (internal marks omitted).  This is not a matter where there is simply not enough meat on the bones of PHMSA's decisions; there are no bones at all.

Furthermore, the Court cannot reasonably discern PHMSA's path to its decisions. Although Defendants argue that the Court can divine PHMSA's reasoning from the administrative record as a whole, that is simply not the case.  The Response Plans contain approximately 2,000 pages of detailed and often technical information.  It is neither feasible nor appropriate for the Court to sift through the Response Plans and independently conclude that they meet the CWA requirements.  See Motor Vehicle Mfrs., 463 U.S. at 43 ("The reviewing court should not attempt itself to make up for [an agency's] deficiencies."); see also SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("We may not supply a reasoned basis for the agency's action that the agency itself has not given.").

Accordingly, the Court finds that, as to each of PHMSA's decisions approving Enbridge's Response Plans, PHMSA failed to explain adequately its conclusions that the Response Plans met the CWA's requirements.  Those decisions are, therefore, arbitrary and capricious under the APA. It may be the case that PHMSA can explain its conclusions to approve the Response Plans. Therefore, the Court remands the decisions to PHMSA for a full explanation of its reasons for approving Enbridge's Response Plans.  See Home Builders, 551 U.S. at 657 ("[I]f the [agency's] action [i]s arbitrary and capricious, . . . the proper course [is] to remand to the Agency for clarification of its reasons.")

### C.  Did the Federal Defendants violate NEPA and the ESA?

The parties contend that whether PHMSA has obligations under NEPA and the ESA turns on whether it has the "discretion" to meaningfully influence response plans based on environmental concerns.  NWF Mot. at 37; Fed. Def. Mot. at 23-28; Enbridge Mot. at 28.  NWF

argues that PHMSA is required to prepare environmental impact statements under NEPA and consult with relevant agencies under the ESA, because its approvals are discretionary. Pl. Mot. at 37. Defendants argue that PHMSA's approvals are not discretionary, and therefore NEPA requirements and ESA consultations do not apply to its response plan approvals.

As explained below, the Court concludes that PHMSA has obligations under NEPA and the ESA because its review of response plans includes an exercise of environmental judgment for which the environmental information imparted by way of those statutory processes could well be useful.

### 1. National Environmental Policy Act

Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. NEPA requires an agency to consider not only the direct environmental effects of its decisions, but also the indirect effect. 40 C.F.R. § 1508.8. Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Id.

To that end, "all agencies of the Federal Government shall . . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—"

    (i)     the environmental impact of the proposed action,

    (ii)    any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii)    alternatives to the proposed action,

(iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v)    any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).[21]

This Environmental Impact Statement ("EIS") requirement serves the twin policy concerns that, first, an agency is obligated "to consider every significant aspect of the environmental impact of a proposed action," and second, "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983); see also Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 356 (1989).[22]   Although NEPA does not require a specific agency result, it promotes good decisionmaking by "focusing agency attention, [to] ensure[] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 371 (1989); see also 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public

---

[21] Major federal actions include actions "which are potentially subject to Federal control and responsibility."   40 C.F.R. § 1508.18.   Major federal action includes "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." 40 C.F.R. § 1508.18(b)(4).   Defendants are not contesting that review of response plans concerns major federal action.

[22] An EIS can be avoided by preparation of an environmental assessment ("EA"). 40 C.F.R. § 1501.4(a)(1).   The EA serves as a first step to determine whether "preparation of a fully polished, high-budget [EIS]" is warranted.   Friends of Fiery Gizzard v. Farmers Home Admin., 61 F.3d 501, 504 (6th Cir. 1995).   If an agency, based on the EA, determines that an EIS is not required, then it must issue a "finding of no significant impact", 40 C.F.R. § 1501.4(e)(1), which briefly sets forth the reasons why the agency's action will have no "significant effect on the human environment," 40 C.F.R. § 1508.13.

officials and citizens before decisions are made and before actions are taken.").  Accordingly, federal agencies must comply with NEPA "to the fullest extent possible" unless "a clear and unavoidable conflict in statutory authority exists."  Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 787-788 (1976) (quoting 42 U.S.C. § 4332).

The Supreme Court has instructed that the touchstone for the applicability of NEPA is whether its process would be "useful" to an agency's decision-making process.  "[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process."  Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 767 (2004) (some internal marks omitted).  "Where the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS."  Id. (citing Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.), 422 U.S. 289, 325 (1975)).

### 2.  The Endangered Species Act

"The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost.  This is reflected not only in the stated policies of the Act, but in literally every section of the statute."  Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184 (1978); 16 U.S.C. § 1531, et seq.  The ESA's Section 7 requires federal agencies to consult with the appropriate environmental agencies before taking an action that may affect endangered species or habitats.  16 U.S.C. § 1536(a)(4).  After the consultation, an opinion will be issued to the agency addressing how the proposed action is likely to affect endangered species and critical habitats.  Id. § 136(b)(3)(A).

However, the ESA-consultation is triggered only if "there is discretionary Federal

involvement or control," 50 C.F.R. § 402.03, because Congress did not intend Section 7 to apply "where the federal agency currently lacks the discretion to influence the private activity for the benefit of the protected species."  Sierra Club v. Babbitt, 65 F.3d 1502, 1512 (9th Cir. 1995). "Whether an agency must consult does not turn on the degree of discretion that the agency exercises regarding the action in question, but on whether the agency has any discretion to act in a manner beneficial to a protected species or its habitat."  Natural Res. Defense Council v. Jewell, 749 F.3d 776, 784 (9th Cir. 2014) (en banc) (emphasis in original).  "The relevant question is whether the agency could influence a private activity to benefit a listed species, not whether it must do so."  Karuk Tribe of California v. U.S. Forest Serv., 681 F.3d 1006, 1025 (9th Cir. 2012) (emphasis in original) (citing Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv., 340 F.3d 969, 977 (9th Cir. 2003).

### 3.  PHMSA Discretion

Regarding whether PHMSA has discretion in reviewing response plans, the parties dispute the meaning of 33 U.S.C. § 1321(j)(5), which governs response plan approval.  PHMSA interprets section 1321(j)(5) as affording it no discretion in response plan approval.  Defendants argue that PHMSA's interpretation of section 1321(j)(5) is reasonable and, therefore, it should be afforded deference under Chevron.  Enbridge Mot. at 30-31; see also Fed. Def. Mot. at 28.  NWF disagrees. As explained below, the Court finds that the CWA unambiguously affords PHMSA the discretion necessary to require compliance with NEPA and the ESA, making PHMSA's contrary interpretation of the statute an unreasonable one.

As noted above, the Court must review competing statutory interpretations under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  The first step under Chevron is to determine whether Congress has "directly spoken to the precise question at issue."

Id. at 842.  "If the statute is unambiguous, then Congress has spoken to the precise question at issue," which ends the matter.  Sunrise Coop, 891 F.3d at 656.

The issue of whether agencies have the necessary discretion and authority under the CWA to deny oil spill response plans has not often been addressed by the courts.  The only case to take this issue head-on is Alaska Wilderness League v. Jewell, 788 F.3d 1212 (9th Cir. 2015).  In Jewell, environmental groups brought an action under the APA arguing that the Bureau of Safety and Environmental Enforcement's ("BSEE") approval of two oil spill response plans was arbitrary and capricious.  BSEE is the Department of the Interior agency responsible for approving response plans for "offshore facilities" under the CWA.  The environmental group argued, as here, that BSEE's response plan approvals for offshore facilities were discretionary and therefore subject NEPA and the ESA.  In a split decision, the Ninth Circuit found that BSEE reasonably interpreted the response plan approval statute as not affording BSEE discretion.  The environmental group filed a petition for rehearing en banc, which was denied.  Alaska Wilderness League v. Jewell, 811 F.3d 1111 (9th Cir. 2015).  However, three judges dissented from the denial of rehearing en banc in a published dissent authored by Judge Ronald M. Gould.  Id. at 1111.  Jewell is instructive for the present case.

The Jewell panel majority held that the statutory language and the structure of 33 U.S.C. § 1321(j)(5) is ambiguous.  788 F.3d at 1220.  The CWA states that "[t]he President shall issue regulations which require an . . . operator . . . to prepare and submit to the President a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance."  33 U.S.C. § 1321(j)(5)(A)(i) (emphasis added).  The statute further provides the following six requirements that response plans "shall" meet:

(i)     be consistent with the requirements of the National Contingency Plan [NCP] and Area Contingency Plans [ACP];

(ii)    identify the qualified individual having full authority to implement removal actions, and require immediate communications between that individual and the appropriate Federal official and the persons providing personnel and equipment pursuant to clause (iii);

(iii)   identify, and ensure by contract or other means approved by the President the availability of, private personnel and equipment necessary to remove <u>to the maximum extent practicable</u> a worst case discharge (including a discharge resulting from fire or explosion), and to mitigate or prevent a substantial threat of such a discharge;

(iv)    describe the training, equipment testing, periodic unannounced drills, and response actions of persons on the vessel or at the facility, to be carried out under the plan to ensure the safety of the vessel or facility and to mitigate or prevent the discharge, or the substantial threat of a discharge;

(v)     be updated periodically; and

(vi)    be resubmitted for approval of each significant change.

33 U.S.C. § 1321(j)(5)(D) (emphasis added).  The statute further provides that with respect to a response plan submitted under 33 U.S.C. § 1321(j) the President "shall"

(i)     promptly review such response plan;

(ii)    require amendments to any plan that does not meet the requirements of this paragraph;

(iii)   approve any plan that meets the requirements of this paragraph;

(iv)    review each plan periodically thereafter; and

(v)     in the case of a plan for a nontank vessel, consider any applicable State-mandated response plan in effect on August 9, 2004, and ensure consistency to the extent practicable.

33 U.S.C. § 1321(j)(5)(E)(i-v).

The <u>Jewell</u> majority reasoned that the three instructions – "to the maximum extent practicable," the six enumerated criteria, and the "shall approve" requirement under section

1321(j)(5)(E)(iii) – created an ambiguity.  The majority reasoned that although the "maximum extent practicable" language suggested discretion, the six requirements read like a check list, which, if met, requires response plan approval.  788 F.3d at 1220.  The majority further reasoned that the structure of the statutory section created ambiguity because the statutory halves do not correspond to each other.  Id.  In other words, it "is unclear how the broad language of section 1321(j)(5)(A)(i), with its reference to the 'maximum extent practicable,' interacts with the finite statutory criteria of section 1321(j)(5)(D) [the six enumerated response plan requirements]."  Id.  Therefore, the majority held that because the statute is ambiguous, BSEE's interpretation that it did not have discretion in the response plan approval process deserved deference under Chevron.  Id. at 1221.  Judge Gould and two other Ninth Circuit judges disagreed.

Judge Gould criticized the majority decision for erroneously affording Chevron deference to BSEE's interpretation of a statute where no ambiguity exists.  Jewell, 811 F.3d at 1112 (Gould, J., dissenting).  Judge Gould explained that the CWA's "to the maximum extent practicable" language unambiguously gives discretion to BSEE over oil spill response plan approval.  Id. at 1113 (citing 33 U.S.C § 1321(j)(5)(A)(i)).  And unlike the majority's finding that the two halves of the statute do not "correspond to each other," he pointed out that the same language – "to the maximum extent practicable" – is in one of the six response plan requirements.  Id. (citing 33 U.S.C § 1321(j)(5)(D)(iii)).[23]  The majority opinion agreed that this phrase "suggests agency discretion."  Jewell, 788 F.3d at 1220.  Therefore, the statutory halves, Judge Gould reasoned, are

---

[23] PHMSA uses the same phrase in its regulations.  See 49 C.F.R. § 194.115(a) ("Each operator shall identify and ensure, by contract or other approved means, the resources necessary to remove, to the maximum extent practicable, a worst case discharge and to mitigate or prevent a substantial threat of a worst case discharge."); see also 49 C.F.R. § 194.107(a) ("Each response plan must include procedures and a list of resources for responding, to the maximum extent practicable, to a worst case discharge and to a substantial threat of such a discharge.").

<u>not</u> at odds with each other.  The Court agrees with Judge Gould's reading of the statute.

The Federal Defendants, relying in part on the <u>Jewell</u> majority opinion, argue that the CWA does not give PHMSA discretion to decide whether a response plan is "acceptable," nor does it have the discretion to "disapprove" a response plan that meets the criteria under 33 U.S.C. § 1321(j)(5)(E)(i-v).  Fed. Def. Mot. at 32; <u>see also</u> Enbridge Mot. at 33.  These arguments are obviously flawed.

The CWA explicitly allows PHMSA to "require amendments to any plan that does not meet the requirements of this paragraph."  33 U.S.C. § 1321(j)(5)(E)(ii).  In other words, if PHMSA <u>decides</u> a response plan is not "acceptable," it may exercise its discretion to reject the plan and require the response plan to be amended before it will be approved.  As to whether PHMSA can disapprove a response plan that meets the relevant criteria, the answer appears to be that it cannot, which was enough for the majority in <u>Jewell</u> to find that agencies have no discretion in the approval process.  However, there is a gap in that logic.  The <u>Jewell</u> majority's reasoning assumes that there is no discretion in evaluating whether the response plan requirements are indeed met in the first place, which is the point Judge Gould made.

Judge Gould criticized the majority opinion for relying so heavily on the "shall" approve any plan that "meets the requirements of this paragraph" language without giving consideration to the substance of those requirements.  <u>Jewell</u>, 811 F.3d at 1113 (Gould, J., dissenting).  Indeed, in other contexts, courts have found "shall" approve language to be no barrier to triggering the application of NEPA.  For example, in <u>RESTORE: The North[ern] Woods v. United States Department of Agriculture</u>, the court found that the United States Forest Service failed to comply with NEPA when it conveyed land to a private company under the Sugarbush Land Exchange Act of 1996.  968 F. Supp. 168, 170 (D. Vt. 1997).  The <u>RESTORE</u> court explained the following:

> To be sure, if the land is acceptable, and if [the private company] transfers land and/or cash equal in value, Congress has directed that the Secretary "shall . . . convey all right, title, and interest of the United States in and to the land." The Forest Service does lack the discretion to convey less than all right, title, and interest, or to refuse to make the exchange if all the conditions are met. But it does not lack all discretion in the process, its actions are not purely ministerial, nor will compliance with NEPA be an empty formality.

Id. at 174. Here, as in RESTORE, PHMSA does not lack all discretion in the approval process. Specifically, two of the criteria under § 1321(j)(5)(D) call for discretion, which is enough to require compliance with the ESA and NEPA.

Other aspects of the statute show the considerable environmental judgment that must be exercised. Section 1321(j)(5)(D)(iii) requires a response plan to identify and ensure the availability of "personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge . . . and to mitigate or prevent a substantial threat of such a discharge." 33 U.S.C. § 1321(j)(5)(D)(iii) (emphasis added). "'Remove' . . . refers to containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches." 33 U.S.C. § 1321(a)(8) (emphasis added). Under PHMSA's regulations, "[m]aximum extent practicable means the limits of available technology and the practical and technical limits on a pipeline operator in planning the response resources required to provide the on-water recovery capability and the shoreline protection and cleanup capability to conduct response activities for a worst case discharge from a pipeline in adverse weather." 49 C.F.R. § 194.5.

This is not a checkbox requirement that is met if an operator identifies two responders and a bucket; it requires PHMSA to bring its expertise to bear on the sufficiency of personnel and

equipment within the limits of available technology to remove and mitigate oil spills.  PHMSA has the discretion to decide a response plan is lacking in this regard and send it back to the operator for correction.

Section 1321(j)(5)(D)(i) also confers discretion upon PHMSA in the response plan review process.  The first requirement is that a response plan must be "be consistent with the requirements of the [NCP] and [ACP]."  33 U.S.C. § 1321(j)(5)(D)(i).  The NCP is described at 42 U.S.C. § 9605 and is set forth at 40 C.F.R. Part 300, et seq.  The plan sets forth "procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants . . . ."  42 U.S.C. § 9605.  The NCP's top priority is safety of human life followed immediately by stabilizing an oil spill to, among other things, "minimize adverse impact to the environment."  40 C.F.R. § 300.317 ("[S]afety and stabilization are the highest priorities").  "The NCP contains numerous phases of operational responses to a spill, including a special response to worst case discharges, and includes several protections for endangered species."  Jewell, 811 F.3d at 1113 (Gould, J., dissenting) (citing 40 C.F.R. §§ 300.300-300.335, 40 C.F.R. § 300.135(k)) (internal citations omitted).  "The NCP also requires that environmental evaluations 'be performed to assess threats to the environment, especially sensitive habitats and critical habitats of species protected under the [ESA].'"  Id. (quoting 40 C.F.R. § 300.430(e)(2)(i)(G)).  "Whether an oil company's oil spill response plan is 'consistent with the requirements of the [NCP] and [ACP]' is far from a mechanical determination or 'triggering event[].'"  Id. at 1113-1114 (citing Home Builders, 551 U.S. at 669).

Indeed, the NCP has explicit instructions for evaluating the sufficiency of response plans. It mandates that the Fish and Wildlife Annex to the ACP "[d]efine the requirements for evaluating the compatibility between this annex and non-federal response plans (including those of vessels,

facilities, and <u>pipelines</u>) on issues affecting fish and wildlife, their habitat, and sensitive environments."  40 C.F.R. § 300.210(c)(4)(ii)(I) (emphases added); <u>see also</u> 40 C.F.R. § Pt. 300, App. E at 4.1.4.  The Region Five ACP, which covers Line 5,[24] addresses issues related to environmental impact and endangered species.  The Fish and Wildlife Annex to the Region Five ACP requires the following:

> Facility owners or operators must <u>determine the maximum distance at which a worst case oil spill from their facility could cause injury to fish and wildlife and sensitive environments and develop a plan for mitigating that discharge's potential adverse effects</u>. Facility plans must be consistent with the requirements of the NCP, the National Response Framework (NRF), RCP and this ACP Annex. Pipeline plans in the Region will be reviewed and approved by DOT.

Fish and Wildlife Annex to the ACP Part I subheading 10 — Compatibility of Non-Federal Response Plans (emphasis added).[25]

The ACP makes clear that PHMSA must review response plans and decide if they contain adequate plans to mitigate environmental consequences.  Determining whether a response plan is consistent with the NCP and ACP, which specifically calls for environmental protection, again calls for PHMSA to exercise its judgment and expertise in the approval process.  This is not a box to be checked; and PHMSA should not review a response plan's adequacy "on incomplete information, only to regret its decision after it is too late to correct."  <u>Marsh v. Oregon Nat. Res. Council</u>, 490 U.S. 360, 371 (1989).

Defendants' analysis, like that of the <u>Jewell</u> majority, is faulty because it ignores the underlying rationale for evaluating whether the agency has any discretion.  The rationale is that where an agency <u>cannot</u> take into account environmental concerns in its decisonmaking, then

---

[24] <u>Available at</u> http://www.rrt5.org/RCPACPMain.aspx.

[25] <u>Available at</u> http://www.rrt5.org/RCPACPMain/RCPACPAppendices/FishWildlifeAnnex.aspx.

compliance with NEPA and the EPA would serve no purpose.  So long as some elements of the decisionmaking involve environmental judgments for which information supplied through the NEPA and ESA processes might reasonably be useful, the decisionmaking is discretionary.

Even if some of the § 1321(j)(5)(D) criteria are mechanical, some are clearly not.  Some discretion is all that is required to trigger compliance with NEPA and the ESA.  See RESTORE, 968 F. Supp. at 173 (finding that the U.S. Forest Service was not exempt from NEPA where a land exchange statute "indicates that Congress has limited, but not eliminated, the Secretary's discretion in this land exchange").  Therefore, there is discretion as a matter of law.

Defendants rely on cases in which the relevant agencies had no discretion to consider environmental consequences:  Department of Transportation v. Public Citizen, 541 U.S. 752 (2004) and National Association of Home Builders v. Defenders of Wildlife, 551 U.S. 644 (2007).  Neither is apposite.

In Public Citizen, the Supreme Court held that the Federal Motor Carrier Safety Administration's ("FMCSA") did not violate NEPA when it failed to analyze the impact of increased cross-border truck traffic in its EA, because it had no authority to take environmental consequences into its decisionmaking with respect to vehicle registration.  Pub. Citizen, 541 U.S. at 764.  The President had lifted a moratorium on the issuance of new operating licenses to Mexican motor carriers.  Id. at 760.  Shortly thereafter, FMCSA issued new proposed safety regulations for Mexican motor carriers along with an EA.  Id. at 760-761.  Based on the EA, FMCSA concluded that because "the entry of the Mexican trucks was not an 'effect' of its regulations, it did not consider any environmental impact that might be caused by the increased presence of Mexican trucks within the United States."  Id. at 761.

The Supreme Court agreed and held that the FMCSA could not be the indirect effect of

increased emissions, because it was the presidential order allowing Mexican carriers into the United States that caused the increase in emissions, and FMCSA lacked authority to countermand the President.  Id. at 766, 769-770.  It further explained that "FMCSA has only limited discretion regarding motor vehicle carrier registration: It must grant registration to all domestic or foreign motor carriers that are 'willing and able to comply with' the applicable safety, fitness, and financial-responsibility requirements."  Id. (quoting 49 U.S.C. § 13902(a)(1)).  In other words, "[s]ince FMCSA has no ability categorically to prevent the cross-border operations of Mexican motor carriers, the environmental impact of the cross-border operations would have no effect on FMCSA's decisionmaking – FMCSA simply lack[ed] the power to act on whatever information might be contained in the EIS."  Id.

Public Citizen thus stands for the proposition that NEPA has application only where the agency has the authority to utilize the environmental information that a NEPA review would generate.  If it has no such authority, the information would not be useful and need not be generated.

Similarly, in Home Builders, the Court addressed a tension between the CWA's requirement to transfer certain permitting powers to state authorities and one of the ESA's consultation requirements under Section 7.  551 U.S. at 649.  The CWA allows states desiring to issue their own permits under the National Pollution Discharge Elimination System ("NPDES") to submit applications to the EPA, which the EPA must approve so long as a state meets nine criteria.  33 U.S.C. § 1342(b).  The majority found that the agency's determination for transfer to state authorities was not discretionary, because the criteria that were to be applied by the agency "all relate to whether the state agency that will be responsible for permitting has the requisite authority under state law to administer the NPDES program."  Home Builders, 551 U.S. at 651.

The Court observed that the decision to authorize the transfer of NPDES permitting authority was essentially mechanical.  Id. at 671.  Determining whether state law authorizes something is not an exercise of environmental judgment and consequently not an exercise for which environmental-impact information would be useful.

Here, unlike in Public Citizen and Home Builders, the CWA directs PHMSA to review response plans for compliance with environmental concerns and grants it the authority to exercise its discretion to require operators to amend response plans it deems deficient.  PHMSA's response plan approvals are based on the experience and training of the agency, which are the hallmark indicia of discretion.  It cannot be reasonably in dispute that PHMSA has the discretion under the CWA to take into account environmental concerns before approving response plans.  PHMSA's assertion that it has no discretion under § 1321(j)(5)(D) is unreasonable and entitled to no Chevron deference.  See Sunrise Coop., Inc., 891 F.3d at 656 (noting that if a statute is unambiguous, then Congress has directly spoken to the precise question at issue, which is an "end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress") (citing Chevron, 467 U.S. at 842-843).  PHMSA has the necessary discretion to trigger the ESA and NEPA's obligations.

Because PHMSA failed to meet its obligations under the ESA and NEPA based on an erroneous reading of the CWA, its approval of the response plans at issue here was arbitrary and capricious.  Accordingly, the Court grants NWF's motion for summary judgment and denies Defendants' respective cross-motions for summary judgment in this regard.

## IV.    CONCLUSION

NWF asks the Court to vacate the Response Plan approvals and require an EIS.  NWF Mot. at 36-37.  However, such decisions are "properly left to the informed discretion of the responsible

federal agencies." <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976).  The appropriate course is to remand this matter to PHMSA for further consideration consistent with this Opinion.  <u>Home Builders</u>, 551 U.S. at 658.

For the foregoing reasons, the Court grants in part and denies in part NWF's motion for summary judgment (Dkts. 57 & 59), grants in part and denies in part Federal Defendants' cross-motions for summary judgment (Dkts. 64 & 67), and grants in part and denies in part Enbridge's cross-motion for summary judgment (Dkt. 68).  The Court **REMANDS** the Response Plan approvals to PHMSA (i) to explain with specificity its reasons for the approvals, (ii) to consult with the appropriate environmental agencies before approving any response plan for the Superior Region Response Zone or the Great Lakes Response Zone that may affect endangered species or habitats, (iii) to comply with NEPA by either preparing an environmental assessment or an environmental impact statement consistent with the law before approving any response plan for the Superior Region Response Zone or the Great Lakes Response Zone, (iv) and for further consideration consistent with this Opinion.

SO ORDERED.

Dated:  March 29, 2019                          s/Mark A. Goldsmith
      Detroit, Michigan                         MARK A. GOLDSMITH
                                        United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 29, 2019.

                                    s/Jennifer McCoy
                                    Case Manager